**Johnny Frank GARRETT, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 69088.**

Court of Criminal Appeals of Texas, En Banc.

Sept. 19, 1984.

Rehearing Denied Nov. 7, 1984.

Bruce Sadler, Amarillo, for appellant.

Danny E. Hill, Dist. Atty. and Vicki Howard, Asst. Dist. Atty., Amarillo, Robert Huttash, State's Atty., Austin, for the State.

## OPINION

TOM G. DAVIS, Judge.

Appeal is taken from a conviction for capital murder. After finding appellant guilty, the jury returned affirmative findings to the two special issues submitted under Art. 37.071(b), V.A.C.C.P. Punishment was assessed at death.

Appellant was convicted of murdering T____ B____, an elderly nun at the St. Francis Convent in Amarillo, "in the course of committing or attempting to commit the offense of aggravated rape" of the said victim.

In his first ground of error, appellant challenges the sufficiency of the evidence to sustain the conviction. Specifically, appellant contends that the circumstantial evidence relied upon for conviction does not "exclude every other reasonable hypothesis except that of the guilt of the accused."

At approximately 7:00 o'clock a.m. on October 31, 1981, the nude body of the victim was found on the floor of her room in the St. Francis Convent by a nun who had noticed the deceased missing at chapel earlier that morning. Another nun testified that she passed by the deceased's open bedroom door at midnight the night before and heard her breathing. She further testified that although there was blood on the deceased's face when the body was found that morning, the nuns did not suspect foul play and had the body removed by a funeral home. The police were summoned after the nuns discovered a broken window in the ground level recreation room. The screen to the window had been cut, and was on the pavement outside.

The police found a bent "serrated edge" table knife under the deceased's bed, along with a set of lower dentures. What appeared to be blood was found on the wall next to the bed, the bed sheet, the deceased's nightgown, and pillowcase. A different knife, a "Forgecraft" steak knife, was found outside of the convent in the driveway.

Dr. Ralph Erdmann, a pathologist, performed the autopsy on the body. He testified that the deceased "had sustained multiple blunt force trauma about the face, chest, and arms," as well as stabbing wounds to the chest. He further stated that the body had injuries to the front and back of the neck, and that death was caused by manual strangulation which resulted in "cardiac arrest due to cerebral anoxia." Injuries to the front of the neck appeared to be caused by a hard and thin object, "consistent with" the shape of the knife found under the bed.

Dr. Erdmann took vaginal washings of the deceased and found the presence of sperm and male prostate secretions. Hemorrhaging indicated that the hymen had been recently torn.

Latent fingerprints identified as appellant's were found on the headboard of the deceased's bed, and on the knife found under the bed. Officer Stephens testified that one print taken from the knife matched appellant's left middle fingerprint, and that another print on the knife matched appellant's left palm print. A print taken from the upper part of the back of the headboard matched appellant's left ring finger. Although no blood was found on the knife found under the bed, the bedsheet had a striated blood smear on it which, according to Agent Goldsberry of the FBI, was either made by that knife "or by another knife having the same type of striations."

Agent Burwitz of the FBI testified that several pubic hairs found on the floor in the deceased's room matched samples taken from appellant, and that the hairs either came from appellant "or another individual who had precisely the same characteristics, racial characteristics."

Agent Goldsberry testified that the impressions on the screen to the broken window were made by a knife similar to the steak knife found in the driveway of the convent, but he could not positively state that the same knife made the marks. Goldsberry further testified that the steak knife found in the driveway of the convent was the same brand as a steak knife recovered from the kitchen in appellant's residence, and that both knives had "the same degree of use and abuse and very possibly could have originated from the same source."

Lonnie Watley, an inmate and trusty in the Potter County jail during appellant's incarceration there, testified he talked to appellant in jail about the murder. He stated that although appellant was at first reluctant to discuss the matter, appellant eventually admitted breaking into the convent and killing the deceased.

Appellant testified at the guilt stage of the trial, and admitted entering the convent and being in the deceased's room with the knife later found under the bed. However, appellant testified he was in the convent shortly after noon, two days before the murder took place. He stated he entered the convent through the front door, took a knife from the convent cafeteria, and went upstairs to the rooms where the nuns resided searching for a chain with a cross on it, to steal. In one room, a drawer in a chest of drawers would not open and appellant bent the knife trying to open it. He stated that he grabbed the headboard on a bed in one of the rooms so that he could lean over and reach a cross hanging on the wall. At one point appellant heard footsteps approaching and got rid of the knife and fled from the convent.

Appellant now contends that his testimony at trial raises a reasonable alternative hypothesis on appeal, and therefore, the evidence is insufficient to sustain the conviction.

■ The standard for reviewing the sufficiency of the evidence on appeal is the same for direct and circumstantial evidence cases; and that is to view the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Carlsen v. State,* 654 S.W.2d 444 (Tex.Cr.App.1983); *Freeman v. State,* 654 S.W.2d 450 (Tex.Cr.App.1983); *Denby v. State,* 654 S.W.2d 457 (Tex.Cr.App.1983); *Wilson v. State,* 654 S.W.2d 465 (Tex.Cr.App.1983); see also *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).

■ In applying the above standard of review, the "exclusion of reasonable hypotheses" test may be used as one means of analyzing the sufficiency of circumstantial evidence cases. As the opinion on rehearing in *Denby,* supra, noted, "if the evidence supports an inference other than the guilt of the appellant, a finding of guilt

beyond a reasonable doubt is not a rational finding." 654 S.W.2d at 456.

■ Appellant's trial testimony explaining why his fingerprints were found in the deceased's room *does not* constitute an outstanding reasonable hypothesis on appeal. The jury, as the trier of fact, was authorized to accept or reject any or all of this testimony. See *Ables v. State*, 519 S.W.2d 464 (Tex.Cr.App.1975). Furthermore, the State presented rebuttal testimony which challenged the reasonableness of appellant's testimony. One of the nuns testified that the front door was normally locked, or if not, a nun would have been in the office by the front door. In addition, the nuns ate lunch in the cafeteria between noon and 1:00 p.m., and would in all likelihood have seen appellant enter the dining room during the lunch hour to remove a knife. Finally, none of the chests of drawers in the convent had a lock, and there had been no report of a stuck drawer.

■ Appellant's contention is overruled. The evidence summarized above is sufficient to sustain the conviction.

In three grounds of error, appellant complains of the State's use of an oral confession for impeachment purposes. Appellant confessed to detectives Walter Yerger and A.L. Morris while in custody. After his confession had been reduced to writing, appellant refused to sign it. When appellant testified at trial denying his guilt in the murder, his oral confession was used for impeachment by the State.

■ Appellant's first complaint is that the trial court erred in failing to enter an order stating its conclusion that the statement used for impeachment was voluntarily made, as required by Art. 38.22, Sec. 6, V.A.C.C.P., in all cases where a question is raised as to the voluntariness of a statement of the accused. At appellant's trial, outside the presence of the jury, a hearing was held concerning the voluntariness of the oral statement given to Yerger and Morris and the court ruled that the statement was voluntarily given. Although not initially in the record on appeal, the trial court's written order that the statement was voluntarily made, along with the court's findings of fact, has been supplemented to the record before us, and therefore, any error has been cured. See *Bass v. State*, 626 S.W.2d 769 (Tex.Cr.App.1982).

In his next ground of error, appellant contends the court erred in allowing the State to impeach appellant with his oral statement because prior to making the statement, appellant was given an incorrect warning of his constitutional rights as required by Art. 38.22, V.A.C.C.P., and *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Appellant points to the following excerpt from the warnings given to him:

"I have the right to remain silent and not make any statement at all and that any statement I make *can and will* be used in evidence against me at my trial." (emphasis added)

Appellant contends the warning given is insufficient because Art. 38.22, Sec. 2(a)(1) provides that an accused must be warned that "any statement he makes *may* be used against him at his trial" (emphasis added).

■ Appellant's contention is overruled. First, we fail to see how substituting "can and will" for "may" in any way lessens the effectiveness of the *Miranda* warnings. Furthermore, Art. 38.22, Sec. 2(a)(1) regulates what must appear on written confessions and is thus inapplicable in determining whether oral statements may be used for impeachment. Since the amendments to Art. 38.22, Sec. 3, effective September 1, 1981, the use of oral statements for impeachment is governed by Art. 38.22, Sec. 5, which provides that oral statements stemming from custodial interrogation are admissible for impeachment purposes if voluntarily made.[1] Statements are

---

1. Art. 38.22, Sec. 5, V.A.C.C.P. provides in pertinent part:

"Nothing in this article precludes the admission of ... a voluntary statement, whether or not the result of custodial interrogation, that has a bearing upon the credibility of the accused as a witness ..."

not *per se* involuntary for impeachment purposes merely because incomplete *Miranda* warnings were given. See *Harris v. New York,* 401 U.S. 222, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971). Finally, we hold that the warnings given appellant in the instant case constituted a "fully effective equivalent" of the warnings mandated in *Miranda,* supra. See *California v. Prysock,* 453 U.S. 355, 101 S.Ct. 2806, 68 L.Ed.2d 696 (1981).

Appellant also contends that his oral statement was inadmissible for impeachment purposes because the officers failed to comply with appellant's request for an attorney. Appellant asserts that after he requested an attorney, the officers nevertheless continued their interrogation of appellant, and thereafter, the statement was made. Appellant asserts that the use of the statement for impeachment violates "appellant's rights under the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution, Article I, Section 10, of the Texas Constitution, and Articles 38.21, 38.22, and 38.23 of the Texas Code of Criminal Procedure."

It is undisputed that appellant was given *Miranda* warnings prior to interrogation. Detective Morris and Lieutenant Boydston initially interrogated appellant for two hours after his arrest, and then turned over the interrogation to Detective Yerger. Appellant asked Yerger if appellant could talk to a District Attorney, and his request was refused. Approximately 10 minutes later, appellant admitted going to the convent, breaking the window, and going inside. Appellant then requested an attorney, and the questioning stopped. Yerger left the room, told Morris about appellant's admission and request, and stated that he had stopped the interview and was going to book appellant into jail. Yerger reentered the room and began filling out an "arrest ticket." Morris entered the room five to ten minutes later and asked appellant, "how is it going?" Yerger told Morris in appellant's presence about appellant's admission to entering the convent, and appel-

lant "got upset with the fact" that Morris had been told. Morris told appellant that he was Yerger's supervisor, and appellant demanded to see Morris' identification, since Morris was in plain clothes. After seeing the identification, appellant stated, "Well, I suppose I should tell you everything," and without further questioning from the officers, gave the confession which was reduced to writing. When the statement was typed up, appellant requested to talk to an attorney before signing. After talking to an attorney, appellant refused to sign the statement.

The State contends that appellant's statement, "Well, I suppose I should tell you everything," evidences appellant's intent to waive his right to counsel and initiate further conversation with the police. In *Edwards v. Arizona,* 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981), the Supreme Court stated: "We further hold that an accused, such as Edwards, having expressed his desire to deal with police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." 451 U.S. at 484, 101 S.Ct. at 1884. The State points to the opinion of the United States Supreme Court in *Oregon v. Bradshaw,* 462 U.S. 1039, 103 S.Ct. 2830, 77 L.Ed.2d 405 (1983), in which it was held that an accused's statement, "Well, what is going to happen to me now?", made after invoking the right to counsel, was a sufficient "initiation" of conversation within the meaning of *Edwards,* supra. The State maintains that appellant's statement bears "more directly on his intent to voluntarily tell the detectives what had happened" than did the statement found sufficient in *Bradshaw.*

■ We need not decide whether appellant "initiated" further communication with the police under *Edwards* and *Bradshaw.* Since the confession in the instant case was a voluntary statement used for *impeach-*

ment,[2] it is admissible under Art. 38.22, Sec. 5, supra. The statement is also admissible for impeachment purposes as a matter of federal constitutional law under *Oregon v. Hass*, 420 U.S. 714, 95 S.Ct. 1215, 43 L.Ed.2d 570 (1975), and *Harris v. New York*, supra.

In *Hass*, a suspect in police custody who had been given *Miranda* warnings invoked his right to counsel, but was told by the officer who was at the time transporting him to the station that he could not contact an attorney until reaching the station. Thereafter the defendant made several statements, including pointing out where the property he was charged with having stolen was located. The State did not use the statements in its case in chief, but rather used them as impeachment after the defendant had taken the stand and denied complicity in the crime. The Supreme Court relied on *Harris v. New York*, supra, which held evidence obtained from a defendant after incomplete *Miranda* warnings admissible for impeachment purposes, and held that the otherwise voluntary statements by the accused were admissible for impeachment purposes, even though the officer continued his interrogation after the suspect asked for an attorney. The Court also noted:

> "If, in a given case, the officer's conduct amounts to an abuse, that case, like those involving coercion or duress, may be taken care of when it arises measured by the traditional standards for evaluating voluntariness and trustworthiness." 95 S.Ct. at 1221.

Appellant does not contend that his statement was involuntary because of an overbearing of will, coercion, or duress. See *Mincey v. Arizona*, 437 U.S. 385, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978). There is nothing before us to indicate that appellant's statement was involuntary under "traditional standards for evaluating voluntariness and trustworthiness." Since appellant's only claim of voluntariness rested on

the issue of invoking the right to counsel, appellant's contention is overruled. See *Oregon v. Hass*, supra; *Harris v. New York*, supra.

■ In five grounds of error, appellant contends the court's charge is fundamentally defective. Appellant made no objections to the charge when submitted, nor did he offer requested instructions. Under these circumstances, our review is limited to fundamental error.

The indictment alleges in pertinent part that appellant did:

> "knowingly and intentionally while in the course of committing and attempting to commit the offense of Aggravated Rape against T____ B____ intentionally cause the death of T____ B____, an individual, by choking and strangling T____ B____ by manner and means unknown to the Grand Jurors ..."

The pertinent portion of the court's charge provides as follows:

> "Now if you find from the evidence beyond a reasonable doubt that on or about the 31st day of October, 1981 in Potter County, Texas the defendant, Johnny Frank Garrett, did intentionally kill T____ B____ by choking or strangling her, and that said defendant, then and there, was in the course of committing or attempting to commit the offense of aggravated rape, then you will find the defendant guilty of capital murder."

Appellant's first contention is that the charge is fundamentally defective because it "failed to require the jury to find an essential element as alleged in the indictment, i.e. 'that T____ B____ was *an individual*.'"

Appellant relies on *Cumbie v. State*, 578 S.W.2d 732 (Tex.Cr.App.1979), which states that the "omission from the court's charge of an allegation in the indictment which is required to be proved" constitutes fundamental error. Id. at 733.

---

**2.** In its charge, the trial court instructed the jury "that the statement made by the defendant, if it was made, to Walt Yerger and A.L. Morris was admitted for the purpose of impeaching the defendant, if you find that it does impeach him, and you cannot consider such impeachment testimony as any evidence whatsoever of the guilt of the defendant."

In *Sattiewhite v. State*, 600 S.W.2d 277 (Tex.Cr.App.1980), we noted that the above statement in *Cumbie* "is not to be understood to mean that in applying the law to the facts the charge of the court must in every case set out *in haec verba* the factual allegations of an indictment that are supported by evidence." 600 S.W.2d 284, n. 11. We stated that a charging instrument is not fundamentally defective if it requires the jury to find each *essential element* of the offense, and if it comports with the legal theory presented by the State in the indictment. Id. at 285.

In *Boles v. State*, 598 S.W.2d 274 (Tex.Cr.App.1980), we held that an indictment for murder under V.T.C.A. Penal Code, Sec. 19.02 was not fundamentally defective for failing to allege that the victim was an "individual." It follows from *Boles* that a murder victim's status as an "individual" is not an essential element of murder (and capital murder), and therefore, failure to include such allegation in the court's charge, although recited in the indictment, does not constitute fundamental error. *Sattiewhite v. State*, supra. Appellant's contention is overruled.

Appellant's next assertion is that the charge is fundamentally defective because although it required the jury to find that appellant caused the death of the victim "by choking or strangling her," it failed to require the jury to find that such choking or strangling was "by manner and means unknown to the Grand Jurors" as alleged in the indictment.

Max Motley, a member of the grand jury which heard evidence and subsequently indicted appellant, testified at trial that the grand jury was unable to determine the manner and means by which the deceased was choked or strangled. Although Dr. Erdmann, the pathologist who performed the autopsy on the deceased, testified that death was caused by manual strangulation, he did not know the exact means through which the strangulation was effected.

It is well settled that an indictment for murder should set forth the means,

instrument, or weapon used; or if not known, that fact must be stated. See generally 18 Tex.Jur.3rd, Criminal Law, Sec. 205 (1982). It has been stated that "[t]he averment of an indictment that the means causing death was unknown to the grand jury is a material allegation, the substance of which must be proven as pleaded." *Mitchell v. State*, 111 Tex.Cr.R. 101, 10 S.W.2d 87, 89 (1928); see also *Corbett v. State*, 493 S.W.2d 940, 952 (Tex.Cr.App. 1973).

In the instant case the State offered proof in support of the allegation in the indictment that the manner and means were unknown to the grand jury. Thus, no variance between the pleading and proof exists. The question remains whether the failure to instruct the jury to find that the manner and means were unknown to the grand jury constitutes fundamental error.

We hold that it does not. The grand jury's failure to determine the manner and means must be pled in the indictment in order to give notice to the defendant. An unknown manner and means, however cannot be considered to be an essential element of the offense of capital murder. Therefore, in the absence of a variance between the proof and the allegations, and in the absence of an objection, failing to instruct the jury to find that the manner and means were unknown to the grand jury does not mandate reversal. See *Sattiewhite v. State*, supra.

Appellant also contends the charge is fundamentally defective for failing "to require the jury to find a culpable mental state concerning the committing or attempting to commit the offense of aggravated rape." The charge, quoted above, merely required the jury to find that appellant intentionally killed the deceased while "in the course of committing or attempting to commit aggravated rape."

This contention is without merit. We have held that a capital murder indictment alleging murder "in the course of committing or attempting to commit aggravated rape" need not set out the elements

of the aggravated rape. *Granviel v. State,* 552 S.W.2d 107 (Tex.Cr.App.1976). It follows therefore that such elements need not be set out in that portion of the charge applying the law to the facts of the case. This contention is overruled.

Appellant's next contention is that the charge is fundamentally defective because it "permitted a conviction on proof less than required to prove the allegations in the indictment." Appellant asserts that the charge is defective for authorizing a conviction upon proof that appellant caused the death of the deceased "by choking *or* strangling her," when the indictment alleged appellant killed the deceased "by choking *and* strangling her."

 This contention is overruled. First, the terms "choke" and "strangle" are virtually synonymous in this context.[3] Furthermore, it is proper for an indictment to allege the ways an offense may have been committed in the conjunctive, and for those different ways to be charged to the jury in the disjunctive. See e.g., *Zanghetti v. State,* 618 S.W.2d 383 (Tex.Cr.App.1981); *Vaughn v. State,* 607 S.W.2d 914 (Tex.Cr.App.1980); *Brantley v. State,* 522 S.W.2d 519 (Tex.Cr.App.1975).

 Appellant's final challenge to the charge asserts that the charge is fundamentally defective for using the word "kill" when the indictment used the phrase "cause the death of."

This contention is without merit and is overruled. Since "kill" has the same meaning as "cause the death of,"[4] we perceive no error in the charge. Cf. *White v. State,* 632 S.W.2d 752 (Tex.App.1981), (charge substituting "appropriate" for "exercise control over" not fundamentally defective).

In his tenth ground of error, appellant contends his conviction should be reversed "since vital evidence to appellant's defense was destroyed by the State." Dr. Erdmann, the pathologist who performed the autopsy on the deceased, testified that he took vaginal washings of the deceased and found the presence of sperm and male prostate secretions. He did not conduct any tests to determine the blood type of the individual who had produced the sperm and prostate secretions.

Appellant contends that by failing to conduct a test for blood type and by disposing of the vaginal washings, "the State denied Appellant the opportunity to demonstrate his innocence by showing that the blood type of the prostate secretions in question were of a different blood type from his own."

Although appellant cites no authority, he apparently relies upon *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), which holds that it is a violation of due process for the State to withhold evidence favorable to an accused.

 While Dr. Erdmann admitted that there would have been at least a 70 percent chance of identifying the blood type of the individual, had a blood type test been made, he testified that no such test had been conducted. Furthermore, he stated he had used up all of the sample taken and was not able to conduct further tests as to blood type. Therefore, there is no factual basis to support appellant's contention that the State withheld any information favorable to him. Appellant's contention is overruled. See *Wilson v. State,* 581 S.W.2d 661 (Tex.Cr.App.1979) (Opinion on State's Motion for Rehearing).

In a supplemental brief, appellant contends that the trial court erred in excluding four prospective jurors in violation of *Witherspoon v. Illinois,* 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968). Appellant points to no specific statements of the veniremen, merely asserting that "[a]lthough the veniremen in question each stated a general objection to the imposition of the death penalty, they failed to make unmistakably clear their unbending opposition to capital punishment or that such opposition

---

**3.** "Strangle" is defined as "to choke to death by compressing the throat ..." See Webster's New Collegiate Dictionary (1979).

**4.** "Kill" is defined as "to deprive of life ..." See Webster's New Collegiate Dictionary (1979).

would affect their deliberation on issues of fact."

Venireman Mildred Walker stated on direct that she "did not believe in the death penalty," and that no matter what the evidence showed, she would answer one of the punishment issues "no" in order to ensure that the death penalty would not be imposed. Walker did not equivocate at first on examination by defense counsel, but after repeatedly stating she would not vote "yes" under any circumstances, the following exchange took place between Walker and defense counsel:

"Q. ... Let's just say that maybe there had been certain kinds of evidence that you were satisfied that a person did do it deliberately and that you were also satisfied because of maybe his past conduct, or maybe because of other things that had been admitted into evidence, that he would probably do something like this in the future; maybe he had done it a dozen times in the past—

"A. Well, that would be a different story, I suppose.

"Q. ... would you answer the questions 'yes' if you were convinced of that?

"A. If I was convinced of it, yes.

" ...

"Q. Depends on what the evidence was?

"A. Yes."

Thereafter the court questioned Walker and the following dialogue occurred:

"THE COURT; All right. Mrs. Walker, just so there is no misunderstanding, ma'am, I want to be sure that I understand.

"Are you telling me that you would automatically vote against the imposition of the death penalty in any case, no matter what the facts might reveal?

"JUROR: Yes, sir.

"THE COURT: All right. And to carry it one step further, are you telling me that you would automatically answer those questions ... in such a way that the death penalty would not be imposed, regardless of what the facts might reveal?"

"JUROR: Yes, that's the way I feel."

At this point Walker was excused over objection that she had been excused in violation of *Witherspoon.*

In *Witherspoon v. Illinois,* supra, the United States Supreme Court held that a prospective juror may not be excluded by the trial court because of opposition to capital punishment unless the venireman makes it clear either that he would automatically vote against the imposition of capital punishment no matter what evidence was presented, or that his views would prevent him from making an impartial decision as to the defendant's guilt.

■■ Walker's final statements to the judge make clear that she would automatically vote against the imposition of death under any circumstances. Appellant's counsel chose not to request to question Walker further. Under these circumstances, no error is shown. See *Meanes v. State,* 668 S.W.2d 366 (Tex.Cr.App.1983).

Venireman Patsy Wood stated that although she could determine a defendant's guilt or innocence in a capital case, she would have to vote "no" on one of the punishment issues regardless of the evidence because of her "strong" feelings about capital punishment. On examination by defense counsel, Wood did not equivocate:

"Q. Mrs. Wood, are you telling the Court that after having taken an oath to make true answers to those questions and to return a true verdict based upon the law and the evidence ... that you would disregard that oath, and even though you believed that those issues, or one of those issues, or both of those issues, should be answered 'yes' that you would deliberately answer one of them 'no,' because by answering one of the 'no,' you would know in your own mind that

the death penalty could not be imposed.

"A. Yes, sir.

"Q. Would you automatically, Mrs. Wood, prior to hearing any of the evidence, automatically vote 'no,' knowing that the death penalty could not be imposed if you did that?

"A. Yes, sir."

Thereafter the court questioned Wood and she again stated that she would automatically vote against the death penalty, no matter what the facts might reveal. Under these circumstances, the exclusion of Wood was not improper under *Witherspoon,* supra.

Venireman Bernice Brown stated that she believed in punishment, but not the death penalty. She stated that she could not answer both punishment questions "yes," under any circumstances, no matter what the evidence was. Brown also did not waiver in response to questioning by defense counsel:

"Q. Now, let me just ask you this question: Would you automatically, Mrs. Brown, without regard to the evidence, without regard to the evidence at all, would you automatically vote 'no' to those issues just in order to see that the death penalty was not imposed?

"A. Yes, I still would ..."

Therefore, we find that the trial court did not err in excluding venireman Brown under *Witherspoon,* supra.

The last venireman allegedly improperly excluded was Leslie Link. Link also expressed opposition to the death penalty, and stated that no matter what evidence was presented, he would have to violate his oath and answer "no" to one of the punishment issues so that death would not be imposed. In questioning by defense counsel, Link remained firm in his convictions:

"Q. Okay. Now, what the District Attorney is asking and what we need to know, are you telling the Court

right now under oath that you would deliberately answer one of those questions 'no' even though you thought it ought to be answered 'yes,' you see, just so that you would be sure that the accused got a life sentence rather than death?

"A. Yes."

The trial court did not err in sustaining the State's challenge to this juror. Appellant's final contention is overruled.

The judgment is affirmed.