Jennifer Floretta GORDON, Appellant,

v.

The STATE of Texas, Appellee.

No. 01–85–0775–CR.

Court of Appeals of Texas,
Houston (1st Dist.).

June 18, 1987.

Rehearing Denied Aug. 13, 1987.

Catherine Greene Burnett, Morrow & Burnett, Houston, for appellant.

John B. Holmes, Jr., Harris County Dist. Atty., Timothy G. Taft, John Petruzzi, Harris County Asst. Dist. Attys., Houston, for appellee.

Before DUNN, COHEN and SAM BASS, JJ.

## OPINION

COHEN, Justice.

### State's Motion for Rehearing

The State's motion for rehearing is granted. We withdraw all prior opinions in this case and substitute the following opinions.

The jury assessed appellant's punishment at 40 years imprisonment after finding her guilty of murdering her sister, Vigo Techeira, on November 5, 1984. Appellant asserts that the trial court erred in allowing into evidence a videotape of the murder scene; in denying a mistrial following "an emotional outburst" from a State's witness; and in accepting a verdict based upon insufficient evidence. We overrule all points of error and affirm the judgment.

Appellant's second point of error asserts that she was denied a fair trial by the

introduction of an inflammatory videotape of the murder scene. The videotape is part of the appellate record. It is approximately 10 minutes in length and contains no audio. It depicts various parts of the deceased's residence, the scene of the murder. Approximately half of the tape depicts the victim's body.

In addition to the videotape, the State introduced 46 still photographs of the same scenes. Appellant objected to only four of these on the sole basis that they were enlarged.

Appellant objected to the entire videotape, rather than to any specific part of it, complaining that it was prejudicial and inflammatory. The court overruled the objection and admitted the videotape.

■ It is well settled that photographs are admissible if a verbal description of the same scene would be admissible, unless their probative value is very slight and their inflammatory effect great. *Thomas v. State*, 701 S.W.2d 653, 660 (Tex.Crim. App.1985). Former case law that limited the admission of gruesome photographs, unless they tended to resolve a disputed fact issue, has been overruled. *See Terry v. State*, 491 S.W.2d 161, 163–64 (Tex.Crim. App.1973); *Martin v. State*, 475 S.W.2d 265, 268 (Tex.Crim.App.1972).

Believing that videotapes should be judged by the same legal standard that governs the admissibility of photographs, we look to *Thomas*, 701 S.W.2d 653, for guidance. Having viewed the entire tape, we conclude that it has substantial probative value. It shows in detail the location, nature, and extent of the victim's wounds, the location of blood in the bedroom and bathroom, the disarray of furniture within those rooms, as well as other facts that could have aided the jury in deciding the case. The trial court did not abuse its discretion by admitting the tape into evidence.

The second point of error is overruled.

The third point of error asserts that the trial court erred in denying a mistrial following "an emotional outburst" from one of the State's witnesses.

■ During cross-examination of Danette Aguirre, defense counsel sought to impeach Aguirre's testimony by demonstrating that it included facts that were not mentioned in the written statement she gave on the day that she discovered the body. The following transpired:

Q. (By defense counsel) Well, this is a statement, this is a statement that you signed, Dannette?

A. I know. But that day, if you would have felt like me I didn't know if I was coming or going. I walked into that police station and I felt like I was floating. I didn't know if I was going to come or go.

Q. I understand.

A. No, you don't understand. I wish you could have walked in there and had to live with what I have had to live with these past few days and can't sleep. Can't take a shower. Can't even listen to the radio. Now you ask me how that would feel. I even had to go get help from a doctor because I couldn't sleep.

The trial judge immediately granted appellant's request for a recess and excused the jury for the day. According to the record, defense counsel then stated:

"I would like to, I believe the police acquire has to inflame and prejudice this jury we can not have a fair and safe trial."

The court's response was, "That's overruled."

Appellant never requested a mistrial or an instruction to disregard, which could have cured the harm, if any, from this particular event. No error has been preserved.

■ Moreover, case law requires that the accused demonstrate a reasonable probability that the complained-of conduct interfered with the jury's verdict. *Landry v. State*, 706 S.W.2d 105, 112 (Tex.Crim.App. 1985). The record reflects that the prosecutor briefly referred to Aguirre's testimony during closing argument and compared it to appellant's calm demeanor when testifying. The prosecutor's reference was not objected to, and it occupies half of one page

out of a 22 page argument. Such a relatively innocuous reference is not enough to constitute a reasonable probability that the conduct interfered with the jury's verdict, especially in light of the immediate, lengthy recess, the gruesome evidence, and the lengthy record. Point of error three is overruled.

Appellant's first point of error asserts that the evidence is insufficient to support the verdict.

■ In reviewing the sufficiency of the evidence, we view the evidence in the light most favorable to the verdict in order to determine whether any rational jury could have found the elements of the offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *Griffin v. State*, 614 S.W.2d 155 (Tex.Crim.App.1981). Although both parties characterize this as a circumstantial evidence case, the test for determining the sufficiency of the evidence is the same in circumstantial evidence cases as it is when the State relies on direct evidence. *Garrett v. State*, 682 S.W.2d 301 (Tex.Crim.App.1984).

Because of the nature of the case, we will set forth the evidence in considerable detail.

Appellant and her sister, Vigo, were originally from Antigua, a Caribbean island. Vigo married Maurice Techeira, and they lived on Saint Croix in the Virgin Islands. In 1966, Maurice first met appellant when he visited Vigo's family. Around 1976, Maurice and Vigo moved to Baytown, Harris County, Texas, and appellant moved in with them approximately one year later. Also living in the home were Carl and Alonzo, the sons of Maurice and Vigo, who were ages 18 and 13, respectively, at the time of trial.

On two occasions, Vigo was told by Alonzo that while she was gone from the house at night, Maurice had visited appellant in appellant's bedroom.[1] Vigo discussed this with Maurice on one occasion and with

appellant on another. On two occasions, Vigo told appellant to move out and get an apartment of her own. However, appellant did not want to move out. This created "problems" between appellant and Vigo. In addition, Vigo's two sons wanted rooms of their own, which was impossible as long as appellant occupied a bedroom in Vigo's home.

Vigo worked until 9:00 p.m. four days a week as manager of Circus World Toy Store. She would normally leave for work shortly before 9:00 a.m. Appellant worked at Weiner's, but got home between 5:00 p.m. and 6:00 p.m., early enough to do the cooking as part of her household duties. A typical day began about 5:30 a.m. when Vigo arose to fix Maurice's lunch.

On November 5, 1984, Maurice and Vigo were already up when, about 6:00 a.m., they heard appellant screaming. Appellant was screaming and crying because she was having a nightmare in which someone was trying to shoot Maurice. Vigo and Maurice calmed appellant, and Maurice then left for work at about 6:15 to 6:20 a.m.

Carl and Alonzo ate breakfast, and then Alonzo left for school. When Carl left between 7:00 and 7:20 a.m.,[2] Vigo was lying on her bed wearing a nightgown with her eyes closed and the television on. That was the last time Carl saw his mother alive.

Wendy Hamel worked as assistant manager to Vigo at Circus World. They were friends, and sometimes rode to work together. Vigo would call Wendy every morning to wake her up for work. On November 5, 1984, at 8:00 a.m., Vigo called Wendy and asked for a ride to work. They talked and joked for approximately 10 minutes. Wendy said she would pick up Vigo shortly before 9:00 a.m. Vigo was in a jovial mood. This was the last time Wendy spoke to Vigo.

Wendy left her home at 8:45 a.m. and drove 5–6 blocks to Vigo's house, arriving

---

1. While Maurice denied an affair with appellant in his trial testimony, the jury could have concluded otherwise.

2. Appellant denied that Carl left home between 7:00 and 7:20 a.m. She testified that he left home at 7:50 a.m.

about 8:50 a.m., parked in the driveway, and honked the horn. When Vigo did not come out, Wendy knocked on the door and waited several minutes. She got no answer and heard no noise or movement inside. Vigo was very punctual and would usually be waiting outside when Wendy came. Wendy thought she might have missed Vigo on the road and looked for her without success while driving to the toy store.

Meanwhile, appellant's time card for November 5, 1984 reflects that she arrived at Weiner's at 8:53 a.m. Her car was not at home at 8:50 a.m. when Wendy drove up. Danette Aguirre, appellant's friend and co-worker, had punched in at 8:45 a.m., the time they were scheduled "to be in at." She did not remember when she first saw appellant because everyone was busy cleaning up the store, which was flooded.

Over at Circus World, Wendy was worried because Vigo was usually ready to go anywhere at least 30 minutes beforehand.[3] Wendy got to work at 9:10, opened the store, and talked to the supervisor. About 9:20 a.m., Wendy called Vigo's home several times and got no answer. At about 9:50 a.m., Wendy drove back to Vigo's home and again honked and knocked on the door. Again, there was no answer and no noise or movement inside. She stayed for five minutes and returned to the store, arriving around 10:20 a.m.

At Weiner's, appellant approached a co-worker, Danette Aguirre, at about 10:00 a.m. and invited her to come to appellant's home for lunch. This struck Danette as unusual because appellant had never invited Danette to her home for lunch in the three years they had worked together.

At Circus World, Wendy Hamel was calling emergency rooms in Baytown looking for Vigo. Unsuccessful, Wendy returned a third time to Vigo's home, honked, knocked, and waited for several minutes. Again, there was no answer and no noise or movement inside. She returned to work

and continued to call Vigo's home with no answer. About 1:00 p.m., appellant called Wendy at Circus World asking if Vigo was there. Wendy stated that Vigo had not arrived at work, that she was worried, and that she was about to return to Vigo's home. Appellant said that that did not sound like Vigo and that she also would go home and check.

At Weiner's, it was close to 1:00 p.m. when Danette Aguirre went to lunch. Although appellant had invited her for lunch at appellant's house earlier, Danette later agreed to go with Robin, another co-worker, to Jack-in-the-Box. As Danette and Robin were leaving, appellant asked if Danette was going to eat lunch with her at her house, and Danette said that she was going with Robin. Appellant mentioned that she was worried about Vigo not showing up for work, but followed along with Danette and Robin to Jack-in-the-Box.[4] Appellant was unusually quiet and ate nothing. When she repeated that she was worried about Vigo, Danette suggested that she call her brother.

When they returned to Weiner's, appellant wanted to go to her house. Danette rode with her in appellant's car. As they rode, appellant was not listening to Danette and appeared not to be herself. When they arrived, Danette asked appellant if she wanted her to go in with her, and appellant said yes.

As they entered, Danette remarked that the ceiling fan and light were on. Appellant entered the kitchen, where a piece of paper on the kitchen table caught Danette's eye, and appellant said that it was Vigo's work schedule. Appellant remarked that the back door was open, and she closed it. Appellant told Danette to come with her as she walked to the living room and hallway calling Vigo's name. They looked in the first two bedrooms and the bathroom at the end of the hall. Then appellant turned around and had her hand on the wall and looked back at Danette and

---

3. Appellant testified that when she left for work at 8:30 a.m. on November 5, 1984, Vigo was still in bed wearing a nightgown and hair curlers.

4. At trial, appellant testified that she was unconcerned that Vigo failed to show up for work because she sometimes played hooky.

then opened the closed door of the remaining bedroom and screamed.

Danette was standing beside appellant, in front of the door, and all she saw were open drawers and things on the floor, which made her think the house was "robbed or something." Danette told appellant that they had to leave and call the police and that somebody could still be there and hurt them. Appellant said, "Dee, stay here," and Danette said, "Jennifer, are you crazy?" Danette thought that appellant was not scared. Danette had not seen a body at that time, even though she could see whatever appellant could see in the bedroom. Appellant remained inside, while Danette ran outside, scared.

After a short time, Danette went back inside and called appellant's name twice, getting no answer. Danette got up enough courage to walk back to the bedroom, where she discovered appellant dragging Vigo's body by the arms out of the bathroom.[5] Danette saw something like a hole on Vigo's shoulder and said, "Oh, my God." Appellant looked up, saw Danette, and put the body down. Appellant had been pulling Vigo's body toward the bed. Danette saw appellant drag Vigo's body from a point where her midsection was by the bathroom doorway until her feet had gone by. Danette was shocked, and appellant looked shocked to discover Danette there.

Appellant had no tears in her eyes and showed no emotion. When appellant released the body, she stepped over it toward Danette, who started running and ran out the front door with appellant right behind her. Danette felt like she was going to throw up when she got outside. Appellant was standing by the door when Danette told her that she thought she was going to throw up, and appellant looked around, said, "okay," and went back in. Danette had never been so scared and did not know what to do. At that moment, Wendy Hamel drove up.

Wendy had left work about 1:15 p.m. to return to Vigo's. When she arrived, Danette told her that she would not believe what was inside. Danette stayed outside

while Wendy ran inside, where she found appellant standing over Vigo's body calling her name. Appellant was "extremely calm," not crying or distraught in any way. Vigo was face down on the floor, the room was "messed up" with papers all to one side of the room, towels surrounding the body, and much blood. Vigo had on a short, pink bloody nightgown.

Wendy asked appellant if she had called an ambulance, and appellant said no. Wendy thought it unusual that appellant had not called an ambulance because, "you don't know if a person is alive or dead"; Wendy called one. Appellant went to another room, made a telephone call, returned, and started picking up bloody wash towels from around Vigo's body, handing them to Wendy, who asked what to do with them and was instructed to pile them by the bed. Wendy thought appellant was acting "real bizarre" in that she was calm and concerned only about cleaning the room. Appellant picked up some papers that were on the floor, put them in the dresser drawers, and then asked Wendy to help turn the body over.

Wendy thought that she could not touch it, but they turned the body over, which made blood start flowing from the wounds. Wendy could see burns all over Vigo's face, chest, and arms, which had turned her skin pink. When Wendy saw the body, it was half (chest) in the bedroom and half (legs) in the bathroom. When they rolled it over, it was leaning up against the bathroom door, wall, and dresser. Wendy noticed that the carpet was bloody, and that the screen of the window was bent out with blood on the "seal" [sic]. Appellant never cried in Wendy's presence.

At that moment, Danette returned, noticed the body in a different position, said "Oh, my God, I'm going to be sick," and went out again. When Danette peeked back in, she saw appellant coming down the hall with her hands crossed carrying a "vanilla" [sic] folder. Appellant walked silently, showing no emotion. Appellant went to the kitchen and picked up the

---

**5.** Appellant denied dragging Vigo's body, claiming that she could not do so by herself.

phone to call work. Danette took the phone from her, thinking that appellant would be too upset to speak, and became too upset herself to speak. Appellant proceeded to converse on the phone.

Appellant's brother, Walcott (Wallie) Francis, received a call from appellant saying that Vigo had been stabbed. He followed an ambulance to Vigo's home. Wallie noticed that appellant was "real calm" [6] when he arrived, but when he saw his sister Vigo, he began crying. The ambulance crew sent everyone out of the room. Wallie noted that the house did not appear to have been burglarized.

Baytown Police Officer Mitchell Manano was the first officer on the scene. He met Wallie Francis as he entered the house and was directed to the bedroom, where he observed Vigo's body. As he entered, he observed appellant standing in the living room, "fiddling" with the television, acting like she was cleaning the area, and watching television, all of which later struck him as odd. Manano met with the ambulance personnel, who were placing a sheet over the body. Then he went to the kitchen to call for detectives and identification officers.

Officer Manano found appellant in the kitchen, cleaning around the sink area. She took a fryer containing a greasy residue, placed it in the sink, and began cleaning it. He asked her to stop because he had noticed what appeared to be grease on the bedroom wall, and he suspected that the fryer contained evidence that might be destroyed. Appellant continued to clean until Officer Manano insisted she stop and got help from her brother to make her stop. Appellant was only trying to clean one item, the fryer.[7] According to Manano, appellant did not appear "too concerned" about what was going on; she displayed no "true emotion" and appeared to be more interested in soap operas. Wallie Francis also observed appellant watching television in the living room. Appellant did not step outside to be interviewed, as

requested by Manano, but was finally questioned by a detective in the living room.

Michael Morton was the Baytown Police identification officer who collected evidence at the crime scene. After conducting a preliminary survey of the scene with Officer Manano, Horton walked through the house, took still photographs, made a video recording of the scene, and then began collecting evidence. Horton observed that the front half of the bedroom was in extreme disarray, consistent with having been the scene of a struggle. Blood was splattered on the floor, walls, and furniture, and grease was splattered along the hallway outside the bedroom, on the bed, and on the wall next to the bed. The wall stains appeared to have been caused by someone throwing grease. There was a large amount of blood on and around the body, throughout the bed, on top of and running down the nightstand, and splattered on nearly everything in the bathroom.

The only bloodstains in the undisturbed portion of the bedroom were on the window sill. Most of the blood in the bathroom area appeared to have been made by someone touching a surface with blood on their body or being flung from blood-covered portions of the body, although the blood in the back of the bathtub appeared to have dropped straight down and hit the bathtub, as though someone had stood there bleeding. The bathtub and tile area were still damp. Water or some liquid had been used to rinse some blood toward the drain, as though someone had used the shower to wash the blood from himself. The largest amount of blood was in front of the bathroom, in and around the area where the victim lay.

There were no signs of a burglary or disarray elsewhere in the house. The screen of the bedroom window with blood on the window sill had been pushed or pulled outward, but it was not consistent with a burglary because no dust or spider webs on the outside had been disturbed. Various samples of evidence were taken

---

**6.** Appellant testified that Wallie was lying about her lack of emotion.

**7.** In her trial testimony, appellant denied trying to clean the fryer.

from areas where blood or grease appeared to be splattered. The fryer with grease and residue in the bottom (which appellant had tried to clean) was recovered from the kitchen. A gold class ring with a blue stone in it was recovered under the bed, within 12 inches from the body. It had blood on the inside and outside, as though it had been on someone's finger when the hand contacted blood, and as the ring came off the finger, blood was smeared on the inside of the ring. A cursory examination of the victim showed wounds on the back and shoulder area, and blood, grease, and hair curlers in her hair.

While Officer Morton collected evidence, Detectives Rex Elliott and W.R. Harper arrived and investigated. Elliott remembered appellant watching soap operas on television in the living room during the investigation. He noticed that Vigo's nightgown was damp from water or some other liquid, in addition to being bloodstained. As had Officer Morton, Detective Elliott went through the house, inside and out, and found no evidence of burglary. He ruled out the bedroom window as a burglar's place of entry or exit by observing the ground outside, which, although soft enough to take a footprint, showed none. Appellant did not appear to Elliott to be upset and showed no emotion. During his investigation, Elliott contacted Maurice's employer and verified that Maurice was at work that day. He later determined that it took an average of 5.35 minutes to drive from the home to Weiner's, appellant's place of employment.[8]

After being interviewed by police at the scene, appellant came outside and, according to Danette Aguirre, still did not cry.[9]

When Carl heard about Vigo, he came home and asked appellant what had happened. Appellant said that Carl's mother had been killed and that a burglar had tried to rob the house. Appellant showed no emotion as she spoke, which surprised Carl.

A neighbor from across the street saw appellant in the front yard after the police arrived. She was eating an apple, which struck him as "insensitive" in the circumstances.

When Maurice got home, appellant came up and said "Maurice, Lord, Lord, Lord," and he pushed her off. Wallie Francis said the house was burglarized, and someone else said to tell Maurice what happened, whereupon appellant said, "It's Vigo, it's Vigo." The police told Maurice that his wife had been killed. Appellant did not tell him her version. When Maurice checked the house, it did not appear to have been burglarized, and nothing appeared to be missing.

When Carl went to the police station to give his statement, the police showed him the ring they had found near the body. He recognized it as appellant's class ring from Charlottesville High School in the Virgin Islands. When he saw the ring, he started to cry because he "had a feeling" that appellant had killed his mother.

Carl, Alonzo, and Wallie Francis all identified the bloody ring found near the body as appellant's. All three had seen appellant wearing the ring, either usually or always. They had never seen Vigo wear it. In fact, it was too small for Vigo to wear.[10]

Appellant was interviewed at the police station on the night of November 5. Neither at the scene nor at the station did Detective Elliott see appellant show any emotion. Appellant refused to give a written statement. However, she did tell the police that Vigo had received a second phone call that morning at 8:15 a.m.[11]

---

8. Appellant testified that it took her 10–12 minutes to drive to work when she drove "hard," otherwise 15 minutes.

9. Appellant testified at trial that Danette was lying about her lack of emotion.

10. Appellant admitted that the ring was hers. She first testified that Vigo wore the ring on her little finger that day, but then changed her testimony, saying that Vigo could have worn the ring that day. She then admitted that she did not remember, and then again said that Vigo was wearing it. Appellant admitted that Vigo did not wear the ring every day.

11. Appellant denied at trial having told the police about a second phone call.

On November 6, appellant called Danette Aguirre at about 8:00 a.m. Appellant said that she had something to tell Danette, but she could not talk because she was at her brother's house. Appellant did not say what she wanted to discuss. However, when appellant returned to work the next day, she told Danette that she had talked to the police and they had told her what Danette had told them. Appellant then asked Danette to tell her what Danette had told the police. Danette said nothing, and appellant said no more.

An autopsy was performed on Vigo on November 6, 1985, by Assistant Medical Examiner Robert Major Jordan. He found numerous cutting and stab wounds and burns over the entire body. The hair was greasy and still in curlers. There were numerous second degree burns on the face, chest, and extremities, with occasional blisters and some areas of skin slippage. This was consistent with a person having been doused with boiling grease.

The cutting and stab wounds consisted of: two cutting wounds to the neck, one of which was 8″ deep and severed the carotid artery and jugular vein; a stab wound to the left chest, which penetrated the lung; two other stab wounds to the chest; one stab wound to the abdomen; one stab wound through the left arm; and defensive cuts on the hands. The mechanism of death was loss of blood; the cause of death was multiple stab and cutting wounds consistent with a person being cut with a knife. Sperm, drug, and alcohol tests were all negative. Dr. Jordan estimated the time of death at between six and twelve hours prior to the autopsy, but pointed out that such a determination is quite difficult and imprecise.

Department of Public Safety forensic chemist Maurita Howarth compared four items submitted to her: (1) a grease sample from the fryer; (2) a soiled mattress sample; (3) a clean mattress sample; and (4) soiled hair from the victim. After performing comparisons by means of solvency, infrared spectrograph, and "gasthromotography" [sic], she found that the grease extracted from the mattress pad, fryer, and hair had similar physical and chemical properties, which differed from various types of heated, unused shortening. All the grease samples had something added to the grease and could have had a common origin.

Appellant testified that she was upset and crying on November 5, 1984. She testified that it upset her, "in a way," to testify about the murder, "but you know, I'm cool, I'm more relaxed." She testified that she believed a stranger had broken in and killed Vigo in the 20–30 minutes between the time she claimed to have left for work, 8:30 a.m., and the time Wendy Hamel got no answer at the house.

■ This evidence, and the reasonable inferences that may be drawn from it, when viewed in the light most favorable to the verdict, establishes that appellant had a motive to kill Vigo; that she had the opportunity to do so when they were alone in the house, away from witnesses; that she had ready access to the weapons used to commit the murder, including the unusual choice of boiling grease; that the bloody high school ring linked appellant to the body; that appellant demonstrated a guilty mind by attempting to destroy incriminating evidence and to discover confidential communications between Danette Aguirre and the police; that appellant was composed and failed to display normal symptoms of fear or grief upon finding her sister's body; and that appellant's hypothesis, that Vigo was murdered by an unknown intruder, is unreasonable based on the evidence in this case.

The State is not required to prove a motive for murder. Nevertheless, the presence or absence of a motive is probative in evaluating the sufficiency of the evidence. Here, the State proved a motive. The victim, Vigo Techeira, knew that while she was away from home at night, her husband, Maurice, had twice visited appellant in her bedroom. That Vigo's son, Alonzo, found these visits unusual and disturbing can be inferred from the fact that, on both occasions, he revealed them to his mother, rather than ignoring them. That Vigo found these visits significant is shown by the fact that she discussed them with

Maurice on one occasion and with appellant on the other.

Vigo twice told appellant to leave her and Maurice's home and find a residence of her own. Appellant never did so, which created "problems" between her and Vigo. Vigo's sons, Carl and Alonzo, also wanted appellant to leave the home because they wanted rooms of their own. The evidence thus reflects that everyone in the family wanted appellant to leave, except Maurice, Vigo's husband.

There was evidence that Maurice was heavily upon appellant's mind and that she feared separation from him. Indeed, at 6:00 a.m. on the day of the murder, appellant awoke, screaming and crying from a nightmare that someone was trying to shoot Maurice. Appellant's hysterical reaction to a dream about harm to, and permanent separation from, Maurice contrasted markedly with her composure seven hours later upon finding her sister's horribly burned and slashed body. A rational jury could have inferred from this evidence a motive to kill, namely, jealously over Maurice, combined with appellant's fear of expulsion from his home at Vigo's hand.

It was also shown that appellant had ample opportunity to commit the crime undetected. She was intimately familiar with the daily schedule of every household member. A piece of paper that appellant knew contained Vigo's schedule was on the kitchen table. On the morning of the murder, appellant was at home and able to know instantly the moment when she and Vigo were alone. As the household cook, she had easy access to the murder weapons, a knife, a fryer, and boiling grease.

Physical evidence linked appellant to Vigo's body. Appellant's high school ring was found, smeared inside and out with blood, approximately 12 inches from the body. Carl, Alonzo, and Wallie Francis, Vigo's brother, each identified the ring as appellant's. All three had seen appellant wearing the ring, either usually or always; none had seen Vigo wear it. Carl and Alonzo testified that the ring was too small for Vigo to wear. Appellant's confused, inconsistent testimony, obviously trying to link the ring with Vigo and to disassociate it from herself, could have been seen by the jury as lies from a defendant unable to keep a false story straight.

Appellant's conduct upon finding Vigo's body, and soon thereafter, could be viewed as destruction of evidence, from which the jury could have inferred appellant's knowledge of her own guilt. After first encountering Vigo's disfigured body, appellant calmly remained inside the house, dragging it around and cleaning the premises. She was strangely unafraid, and unmoved by Danette Aguirre's warning, that the attacker might still be present or could return. She did not call or ask anyone else to call an ambulance or police, a fact from which the jury could have concluded that she knew Vigo was already dead and wanted more time to alter the premises before the police investigated. Even with the police present, she continued her attempt to clean a fryer containing grease that had been recognized by Officer Manano as a potentially incriminating piece of evidence. Although Manano told her to stop, appellant continued to clean the fryer until he ordered her from the kitchen. Finally, appellant returned to work two days after the killing and tried to get Danette Aguirre to disclose what Aguirre had told police, even while claiming that she already knew of Aguirre's account.

Appellant's attention to television soap operas and consumption of an apple soon after finding the body could have confirmed the jury's well-founded suspicions. The same is true of appellant's repeated, strong, and solitary disagreement with the testimony of one disinterested witness after another.

Finally, there is no reasonable hypothesis raised by the evidence that Vigo was killed by an unknown burglar. Nothing was missing from the home. There was no signs of forced entry. There was no disarray in the other rooms of the house. Although a screen on the bedroom window was pushed or pulled outward, the dust and spider webs outside the window were undisturbed, contrary to what would be expected in a burglary. There were no

footprints on the ground outside the bedroom window, even though the ground was soft enough then to have received a footprint. Moreover, it is unlikely that a burglar would have chosen boiling grease for a murder weapon. It is not a reasonable hypothesis that a burglar would have brought boiling grease with him or that he would have boiled it on Vigo's stove after entering. Evidence concerning Vigo's regular daily routine lessens the likelihood that she would have been boiling grease between 8:30 and 9:00 a.m., as she prepared for or awaited Wendy Hamel's arrival and their ride to work together. This, in turn, reduces the likelihood that the boiling grease was used as a weapon of opportunity, fortuitously available to a sudden intruder.

The evidence, taken as a whole and viewed in a light most favorable to the verdict, was sufficient to enable a rational jury to conclude, beyond a reasonable doubt, that appellant was Vigo's killer.

The first point of error is overruled.

The judgment is affirmed.

SAM BASS, J., dissents.

SAM BASS, Justice, dissenting.

I respectfully dissent from the majority opinion for the reason that I can not, under the evidence, agree with the conclusions, assumptions, and hypotheses set forth in the majority opinion.

The standard for reviewing the sufficiency of the evidence on appeal is the same for direct and circumstantial evidence cases; and that is to view the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Chambers v. State,* 711 S.W.2d 240, 245 (Tex. Crim.App.1986); *see also Garrett v. State,* 682 S.W.2d 301, 304 (Tex.Crim.App.1984). In applying the above standard, the exclusion of reasonable hypotheses test may be used as one means of analyzing the sufficiency of circumstantial evidence. *Garrett,* 682 S.W.2d at 304.

In *Johnson v. State,* 673 S.W.2d 190, 195 (Tex.Crim.App.1984), the court held that: [a] conviction based on circumstantial evidence cannot be sustained if the circumstances do not exclude every other reasonable hypothesis except that of the guilt of the defendant. Thus proof which amounts only to a strong suspicion or mere probability is insufficient. And it must be borne in mind that every circumstantial evidence case must be tested by its own facts to determine the sufficiency of the evidence to support the conviction.

In this case, the conviction was based solely on circumstantial evidence.

No one saw appellant harm the complainant, and no one saw her with a knife. No murder weapon was introduced or connected with appellant.

The evidence when viewed in a light most favorable to the State reveals the following facts. The investigating detective testified that it takes five to seven minutes to drive from the deceased's house to Weiner's. Appellant arrived at work at 8:53, which means appellant must have left the house around 8:42, including time for walking to the car, parking, and entering work. Hamel talked to the deceased at 8:10 a.m. This would have left approximately 30 minutes for the commission of the murder and the cleaning-up afterwards, i.e., the time from 8:10 a.m. to 8:42 a.m.

The evidence indicates that someone stood bleeding in the rear of the shower. Thus, if the appellant was the assailant, since she was not injured, it would have had to have been the deceased in the shower sometime after 8:10, when her telephone conversation with Hamel ended. The repeated cut and stab wounds were the cause of Vigo's death. One of the stab wounds was eight inches deep, and another wound went through the deceased's arm. The number and nature of the wounds shows that they did not occur quickly. Additionally, the evidence of blood stains on the walls of both the bedroom and bathroom indicate that a struggle took place.

Also, since both the major artery and vein in the neck were severed, and given

the blood pattern on the walls, the assailant should have also been bloodstained. Therefore, if appellant was the assailant, she would have had to shower and change clothes before leaving for work. No stained or wet clothes of the appellant were recovered or placed in evidence.

There is a reasonable hypothesis other than appellant's guilt, that being, that the deceased was killed by an unknown person. This hypothesis can also be supported by the circumstances surrounding the murder. The officer testified that the blood found in the shower appeared to have been left by someone standing bleeding in the shower. Appellant had no wounds, and the deceased was murdered with her nightgown on, which is how she was last seen by her son. Therefore, it is reasonable to conclude that the deceased's assailant was injured during the struggle and the unknown person left the blood found in the rear of the shower.

The evidence reflects that there was a possible means of entry to the house by an open back door. The deceased could have been alive and inside the house, being held by her assailant, when Hamel arrived at 9:00 a.m.

The fact that the neighbor claims to have been outside from 8:00 to 9:00 a.m., and to have seen no one other than Hamel, does not rebut the possibility of an intruder. The neighbor could not see the sides and back of the deceased's house, where the back door was left opened. Also, he did not see the appellant leave for work.

In considering the reasonable hypothesis that someone other than the appellant committed the crime, all testimony showed that the relationship between the two sisters was close. The circumstantial evidence in this case raises a suspicion of appellant's guilt. However, it is the court's duty to insure that no one is convicted of a crime except upon proof beyond a reasonable doubt, and, upon proof excluding all other hypotheses except appellant's guilt. Because of the failure of the evidence to meet the required burden of proof, appellant's point of error one should be sustained, and

the judgment should be reversed, and an order of acquittal should be entered.