**Elbert Harvey STANTON, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 05–86–01247–CR.**

Court of Appeals of Texas,
Dallas.

March 11, 1988.

John H. Hagler, Dallas, for appellant.

Anne B. Wetherholt, Dallas, for appellee.

Before WHITHAM, McCLUNG and STEWART, JJ.

STEWART, Justice.

A jury convicted Elbert Harvey Stanton of murder and assessed punishment at life imprisonment. Appellant raises seven points of error, contending that: (1) the

evidence is insufficient to support the conviction; (2) an exhibit allegedly referring to extraneous offenses was erroneously admitted; (3) appellant's oral statements made while in police custody were inadmissible; (4) the trial court erred in sustaining the State's challenge of a juror for cause; (5) the jury should have been instructed on confinement as a condition of probation; (6) the jurors' discussion of parole laws constituted reversible error; and (7) the jury's verdict was not unanimous. Finding no merit in appellant's contentions, we affirm the judgment of the trial court.

## I. *Sufficiency of Evidence*

■ In point of error one, appellant asserts that the evidence is insufficient to support the conviction. Specifically, he contends that the record shows that he shot Kerry Thurman by accident or in self-defense. The standard for appellate review of the sufficiency of the evidence is to view the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Garrett v. State*, 682 S.W.2d 301, 304 (Tex.Crim.App.1984), *cert. denied*, 471 U.S. 1009, 105 S.Ct. 1876, 85 L.Ed.2d 168 (1985). We now review the evidence with this standard in mind.

The sixty-nine-year-old appellant and Kerry Thurman, the deceased, lived in the same condominium complex. There had been frequent disagreements between the two men, many involving Thurman's dog. On the morning of his death, Kerry's wife Robin was walking the dog without a leash. Appellant saw her and screamed at her that it was against the law and against condominium rules to have the dog outside without a leash and that he was going to call the police. Appellant walked toward her, yelling about a petition and saying that they had no right to kick him out of the complex.

Although Robin testified she knew nothing about a petition at that time, evidence developed later at trial revealed that sixteen condominium owners had signed a petition and complained to management about appellant. Robin testified that appellant appeared upset about the petition when he accused her that morning of trying to kick him out.

Robin turned to walk away from appellant, but turned back to face him when she did not hear the dog following her. She saw appellant kick the dog. She and the dog ran back to her condominium. She was upset that appellant had yelled at her and kicked the dog. Kerry woke up when she entered the condo and Robin told him about her run-in with appellant. Kerry said he would try to talk to appellant.

Kerry got up and began to dress. He could not find his shoes. Robin looked out the door to see if appellant was still there because they thought he might have gone after all the time that had passed while Kerry was looking for his shoes. Robin saw appellant, sitting in his car. He had moved his car from his assigned parking space to a place facing the Thurmans' front door. He could not leave the parking lot from that direction and appeared to be waiting for something. Kerry finally found his shoes. Approximately five minutes had elapsed from the time Robin returned to the condo.

Kerry left the condo and walked toward appellant's car. Robin testified that he was moving at a quick gait but was not running. Kerry crossed the parking lot and then moved around the front of appellant's car to the driver's side. Robin testified that Kerry may have yelled at appellant, but that she did not hear what he said, if anything. Kerry raised his hands, gesturing for appellant to roll down the window. Kerry made no thrusting motion and there was no force used when he moved his hands toward the window. Robin saw a flash, heard a shot and saw her husband fall. She screamed and ran across the parking lot to him. Kerry was covered with blood and glass. She looked in the car and saw appellant sitting there with a gun in his hand. Robin ran to her mother-in-

law's (Kerry's mother) condo and told her "that man" had shot Kerry and told her to call an ambulance. Then she went back out to her husband and held his hand.

Several neighbors came out to the parking lot after hearing the shot and Robin's screams. Appellant opened the car door, stepped over Kerry's body and calmly put the gun back in its zippered case. Appellant, a medical doctor, did not try to aid Kerry who was lying there bleeding. Appellant said he was going to call the police and headed toward his condominium. Kerry's mother encountered appellant on the sidewalk as she was running toward the parking lot. She screamed at him, "you hurt my son," and hit him and threw off his glasses. Appellant merely smiled.

When the police arrived, the paramedics and a crowd of 20 to 25 neighbors were surrounding Kerry's body. Officer Page asked the crowd at large who did it and several persons pointed at appellant. Appellant was very calm and matter-of-fact. He did not appear upset and did not show concern. Appellant told Page the gun was in his apartment and offered to show it to him. Appellant was taken to the jail, where he initiated a conversation with Officer Page. Appellant told the policeman that Kerry had attacked him and smashed out the window on his car.

Officer Burson also spoke to appellant at the police station. He was assigned to perform a handwashing, a test to determine whether a person had fired a gun. Officer Burson explained to appellant what he was going to do. Appellant looked at the bottle of solution sitting on the counter and said, "that has nitric acid in it." Burson asked appellant if he was a chemist and appellant said he was a doctor. Officer Burson put the solution on a swab, preparing to wash appellant's hands. Appellant thrust his right hand at Burson and said, "This is the hand I shot him with. I knew he was dying, but—." Appellant paused, then said, "I'd kill a whole roomful if I had to."

Several neighbors who saw appellant immediately after the shooting testified as to his demeanor. Jack Dilworth saw appellant sitting in his car and heard him say to Robin Thurman, "Yes, I shot him ... He's dead, too. He deserved to die because he threatened me." Appellant was calm and cool and had an air of triumph about him as if he were happy with what he had done. He did not act like a man who had just been threatened and showed no anxiety or fear. Darald Bodine, who considered himself appellant's friend, testified that appellant was acting "in control or a little arrogance [sic]." He showed no remorse or concern for the person he had shot and did not seem afraid or upset. Mark Dilworth also said appellant showed no remorse and did not appear to be a man who had recently been in fear of his life. Appellant appeared very cold. Mark Dilworth heard appellant say Kerry was attacking him, that he had broken the window so appellant shot him. Appellant also said, "He deserved to be shot." Mark Dilworth did not believe Kerry had broken the window because he was such a small person.

Dr. Gilliland, the medical examiner who performed the autopsy on Kerry Thurman, testified that Kerry died from a gunshot wound to the right chest. She found tiny slivers of glass on appellant's clothes corresponding to marks on the skin indicating that the bullet had passed through an intermediate target of glass. An external examination of Kerry's hands revealed no injuries—no bruises, scrapes or cuts. Dr. Gilliland would expect some sign if a person hit a window hard enough to crack it.

Several witnesses testified that Kerry was a small man. He was five feet six inches tall and weighed 122 pounds. He was not very strong. Although appellant was sixty-nine years old, he was very fit. He exercised frequently, swimming laps and jogging. He was much bigger than Kerry.

Appellant testified that Kerry ran toward his car, threatening to kill him. He banged on the top of the car and on the window with enough force to rock the car. Appellant was terrorized. He reached over

and got his gun case out of his medical bag. He displayed the gun case to Kerry, but Kerry kept hitting the car. He unzipped the case and removed the gun and showed it to Kerry. Kerry beat harder on the window and it suddenly shattered. Appellant doubled up in the seat and the gun went off. He did not pull the trigger. Appellant testified, "I was terrorized, panicked, in fear of my life, and he said he would kill me and I was dead."

The jury is the exclusive judge of the credibility of the witnesses and of the weight to be given their testimony. TEX. CODE CRIM.PROC.ANN. arts. 36.13, 38.-04 (Vernon 1979); *Johnson v. State*, 571 S.W.2d 170, 173 (Tex.Crim.App.1978). The jury may believe some witnesses and refuse to believe others and it may accept portions of the testimony of a witness and reject other portions. *Nixon v. State*, 572 S.W.2d 699, 700–01 (Tex.Crim.App.1978). In resolving the conflicting testimony, the jury could have chosen to disbelieve appellant's accident/self-defense claim. The medical examiner testified that the bullet passed through glass before entering Kerry's body. Several witnesses testified that Kerry's body was covered with glass and that there was no glass inside the car. Kerry's hands were not injured, which is inconsistent with a story that he broke glass with his hands. Thus, the jury could have concluded that the glass was intact when appellant fired and that the bullet forced the glass outward rather than Kerry's hands forcing it inward.

The jury could also have believed Robin's testimony that Kerry did not run toward appellant's car or beat on it and that Kerry did not threaten appellant. Thus, the jury could have concluded that appellant's shooting of Kerry was unprovoked and not accidental, that appellant was upset at the condominium residents who were trying to oust him from the complex, and that he thought Kerry was one of the residents who had complained about him.

The jury could also have concluded that appellant's use of deadly force was unreasonable in light of the fact that he could have escaped from Kerry by simply moving his car. The jury could have concluded that this was not a case of a younger man threatening a feeble, older man. Rather, because appellant was physically fit and bigger than Kerry, the jury could have believed that appellant was not reasonable in using his gun.

Having reviewed the evidence in the light most favorable to the jury's verdict, we hold that there is sufficient evidence to support appellant's conviction. Consequently, we overrule point of error one.

## II. *Extraneous Offense*

In point of error two, appellant contends that the trial court erred in admitting into evidence a letter that allegedly refers to extraneous offenses. The letter, signed by the condominium complex manager, stated in pertinent part:

> Enclosed please find a copy of a petition signed by sixteen residents at Turtle Lakes Estates. Along with the petition I received three complaint letters much in the same context as the petition. The letters and petition will be kept on file at the Trans–Cities office for reference if future problems arrive [sic] with Mr. Stanton's conduct.

> The Board of Directors have the power to promote the health, safety and welfare of the Project and its Owners and will use these powers if problems occur in the future.

The petition and complaint letters mentioned were excluded from evidence because the trial court concluded that the State failed to disclose them to appellant pursuant to a pretrial discovery order.

Assuming, arguendo, that the letter does refer to extraneous offenses, we hold that it was, nevertheless, admissible. Although extraneous offenses are ordinarily inadmissible, such evidence is admissible to show motive or intent when such issues are relevant to a material issue in the case. *See Barefoot v. State*, 596 S.W.2d 875, 886

(Tex.Crim.App.1980), *cert. denied,* 453 U.S. 913, 101 S.Ct. 3146, 69 L.Ed.2d 996 (1981); *Etchieson v. State,* 574 S.W.2d 753, 760 (Tex.Crim.App.1978), *cert. denied,* 440 U.S. 936, 99 S.Ct. 1282, 59 L.Ed.2d 495 (1979). Extraneous offenses are also admissible to rebut a defensive theory. *Montelongo v. State,* 681 S.W.2d 47, 55 (Tex.Crim.App. 1984).

Appellant testified that the gun went off accidentally, that he did not intentionally shoot Kerry Thurman. He also denied knowing who Kerry was, testifying that he did not know his neighbors in the condo complex and could not tell them apart except by the dogs they owned. He admitted knowing about the petition. Robin Thurman testified that appellant yelled at her about the petition shortly before the shooting and appeared upset. The condominium complex manager testified that appellant called her about the petition the day before the shooting and was very upset. He threatened to sue her for defamation.

■ Appellant's knowledge that his neighbors made complaints about him, his belief that the Thurmans were among those seeking to drive him out, and the fact that he was very upset about the petition tended to show his motive for shooting Kerry. Thus, it indicated that he acted intentionally, and rebutted his testimony that the shooting was an accident. We hold that the letter, arguably referring to extraneous offenses, was relevant to a material issue—intent—and that the probative value outweighed any potential prejudice. *See Williams v. State,* 662 S.W.2d 344, 346 (Tex.Crim.App.1983). Thus, the letter was admissible. Point of error two is overruled.

### III. *Oral Statement*

In his third point of error, appellant contends that the trial court erred in allowing Officer Burson to testify that appellant told him, "This is the hand I shot him with. I knew he was dying, but ... I'd kill a whole roomful if I had to." Appellant ar-

gues that the oral statement made while in custody was inadmissible.

At the pretrial hearing on appellant's motion to suppress the oral statements, Officer Burson testified that he met appellant at the jail when he was asked to do a handwashing on appellant. Burson knew nothing about the case except that it involved a shooting. Burson took appellant from the hold-over cell, told him who he was, and explained the procedure for the handwashing. When Burson began to put the handwashing solution on the swab, appellant remarked that the solution contained nitric acid. Burson asked appellant if he were a chemist because he was surprised that appellant knew what was in the bottle. Appellant replied that he was a doctor. Before Burson asked appellant for his hand, appellant thrust his right hand at him and made the complained-of statement.

Prior to the handwashing, appellant had been arrested and had been read his Miranda rights at least twice. Burson testified that he did not ask appellant which hand he used to shoot the gun. In fact, the only question he asked was whether appellant was a chemist. Appellant did not testify at the pretrial hearing. The trial court ruled that the statement was admissible.

■ Article 38.22 of the Code of Criminal Procedure provides that oral statements that result from custodial interrogation must be recorded to be admissible. TEX.CODE CRIM.PROC.ANN. art. 38.22, § 3 (Vernon Supp.1988). The State concedes that the statement was not recorded and that appellant was under arrest and, therefore, in custody at the time he made the statement. The State argues, however, that appellant's oral statement was not made in response to custodial interrogation. We agree.

The Supreme Court defines interrogation as:

whenever a person in custody is subjected to either express questioning or its functional equivalent. This is to say, the term "interrogation" under *Miranda* re-

fers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect.

*Rhode Island v. Innis,* 446 U.S. 291, 300–01, 100 S.Ct. 1682, 1689–90, 64 L.Ed.2d 297, 308 (1980). *See also McCambridge v. State,* 712 S.W.2d 499, 505 (Tex.Crim.App. 1986). The State argues that the hand-washing was normally attendant to arrest and custody, as is fingerprinting, photographing, and requests to take a breathalyzer test. *See McCambridge,* 712 S.W.2d at 505. We need not resolve this issue. Rather, we must decide whether there were actions or words that the police should have known were reasonably likely to elicit an incriminating response from appellant.

■ The Supreme Court notes that this portion of its definition focuses upon the perception of the suspect rather than upon the intent of the police. However, the intent of the police is relevant. The intent has a bearing on whether the police should have known that their words or actions were reasonably likely to elicit an incriminating response. *Innis,* 100 S.Ct. at 1690 & n. 7. Further, the Supreme Court recognizes that "the police surely cannot be held accountable for the unforseeable results of their words or actions." *Id.* at 1690.

In this case, Burson asked no express question other than, "are you a chemist." Burson testified that he was shocked when appellant made the incriminating statement and had to ask his superior what kind of report to fill out regarding the statement. It is clear, then, that the police did not intend their actions to elicit an incriminating response. Burson explained to appellant that the handwashing would disclose whether he fired a gun, but we are unpersuaded that this knowledge coerced appellant into revealing that he fired the gun, much less which hand he used or that he was prepared to do it again if he had to.

We hold, therefore, that appellant was not subjected by the police to words or actions that the police should have known were reasonably likely to elicit an incriminating response from him. Consequently, the oral statement was not inadmissible because it failed to comply with the recording requirement of article 38.22. Point of error three is overruled.

## IV. *Challenge for Cause*

In point of error four, appellant argues that the trial court erroneously sustained the State's challenge of a prospective juror for cause. The prospective juror stated unequivocally that she could not consider the assessment of maximum punishment because of the defendant's advanced age.

■ The State contends that, assuming the court erroneously sustained the challenge, appellant has failed to show that he was injured or forced to proceed with an objectionable juror as required by *Smith v. State,* 683 S.W.2d 393, 401–02 (Tex.Crim. App.1984). However, a defendant may show harm simply by showing that the State exhausted all of its peremptory challenges, because the improper excusal for cause effectively gives the State the benefit of an additional peremptory strike. *Bell v. State,* 724 S.W.2d 780, 795 (Tex.Crim. App.1986); *Payton v. State,* 572 S.W.2d 677 (Tex.Crim.App.1978). The State concedes that it exhausted all its peremptory challenges in the instant case. Thus, we must confront directly appellant's contention that the trial court erroneously sustained the State's challenge for cause.

Appellant concedes that bias against the range of punishment is a proper ground for a challenge for cause. *Nethery v. State,* 692 S.W.2d 686, 691 (Tex.Crim.App.1985), *cert. denied,* 474 U.S. 1110, 106 S.Ct. 897, 88 L.Ed.2d 931 (1986); *Martinez v. State,* 588 S.W.2d 954, 955 (Tex.Crim.App.1979). He argues, however, that the prospective juror was not biased against assessing the maximum sentence. Rather, the venireperson was biased against assessing such a

penalty against appellant, an elderly person. Since it is improper to question prospective jurors about specific facts of the case, he argues, it is equally improper to excuse a juror because of a bias regarding the specific fact.

■ We cannot accept appellant's reasoning. The prospective juror was not questioned about her feelings regarding appellant's age. However, his age was apparent to the prospective juror from appellant's physical appearance. To carry appellant's argument to its logical conclusion, a prospective juror could not be excused for cause if he stated that the defendant's race, apparent from his appearance, would prevent him from considering the minimum punishment. Such is not the law. *See Anderson v. State*, 633 S.W.2d 851 (Tex. Crim.App.1982). Further, a juror may be excused for cause if he is biased in favor of a defendant, for whatever reason. *See* TEX.CODE CRIM.PROC.ANN. art. 35.-16(a)(9) (Vernon Pamph.Supp.1988); *Miller v. State*, 687 S.W.2d 33, 40 (Tex.App.—Corpus Christi 1985), *aff'd*, 736 S.W.2d 643 (Tex.Crim.App.1987); *Ransom v. State*, 630 S.W.2d 904, 908 (Tex.App.—Amarillo 1982, no pet.). Thus, we hold that the trial court did not err in sustaining the State's challenge for cause based upon bias and prejudice against the range of punishment and in favor of appellant. Point of error four is overruled.

## V. *Jury Instruction*

■ In his fifth point of error, appellant contends that the trial court erred in denying appellant's request to charge the jury pursuant to article 42.12, section 3g(b) of the Code of Criminal Procedure. He argues that the statute outlines a term and condition of probation and that the law requires instruction to the jury on the terms and conditions of probation. *See Brass v. State*, 643 S.W.2d 443 (Tex.App.—Houston [14th Dist.] 1982, pet. ref'd). This court has declined to follow *Brass* in requiring instructions outlining the terms and conditions of probation set out in section 6a. *Yarbrough v. State*, 742 S.W.2d 62, 64 (Tex.App.—Dallas 1987, pet. filed). We further decline to extend *Brass* to apply to section 3g(b).

The statute provides:

If there is an affirmative finding that the defendant convicted of a felony of the second degree or higher used or exhibited a firearm during the commission or flight from commission of the offense and the defendant is granted probation, *the court may* order the defendant confined in the Texas Department of Corrections for not less than 60 and not more than 120 days. At any time after the defendant has served 60 days in the custody of the Department of Corrections, the sentencing judge, on his own motion or on motion of the defendant, may order the defendant released to probation. The Department of Corrections shall release the defendant to probation after he has served 120 days.

TEX.CODE CRIM.PROC.ANN. art. 42.12, § 3g(b) (Vernon Supp.1988) (emphasis added). By its very terms, the statute vests the trial court with sole discretion to determine whether the probationer should be confined after the jury has recommended probation.

In *Anderson v. State*, 681 S.W.2d 651 (Tex.App.—Amarillo 1984, pet ref'd), our sister court was faced with a similar situation. The trial court refused to instruct the jury pursuant to article 42.12, section 6b(a). That provision, like section 3g(b), vests the trial court with discretion to order the defendant's confinement after the jury recommends probation. The Amarillo court stated:

We do not think the rule enunciated in *Brass* should be extended to the situation here presented. The reference in *Brass* was to those possible terms and conditions enumerated in sec. 6 and 6(a) of the statute which might aid the jury in making the determination in which they participate, *i.e.*, whether or not the defendant should be admitted to probation.

Whether or not to require a period of penal confinement is, on the other hand,

one that can only be made after the initial determination to grant probation. *By the terms of the statute it is a decision to be made after "the defendant is granted probation" and rests solely in the discretion of the court* in which the probation is pending. That being the case, an instruction as to the possibility that the court, in the exercise of that discretion might, *after* the granting of probation, require penal confinement, is not one that is necessary to aid the jury in deciding whether to recommend probation. The trial court did not reversibly err in failing to give the requested instruction.

*Anderson*, 681 S.W.2d at 652 (emphasis added).

◼ In *Peace v. State*, 654 S.W.2d 40 (Tex.App.—Dallas 1983, pet. ref'd), this court considered a jury instruction relating to work release in the event the jury assessed the defendant's punishment at confinement in the county jail. The pertinent statute provides that the trial court may, within its discretion, order work release. *See* TEX.CODE CRIM.PROC.ANN. art. 42.03, § 5 (Vernon Supp.1988). We held that the trial court committed reversible error when it instructed the jury on work release. "The matter of work release, in the event of a jail sentence, is by statute placed within the exclusive discretion of the trial court. Thus, it *is not* and *should not* be a matter to be given consideration by the jury." *Peace*, 654 S.W.2d at 41. (Emphasis original). Confinement after the jury recommends probation, like work release after the jury assesses punishment as confinement, is a matter solely for the trial court. *Anderson*, 681 S.W.2d at 652; *Peace*, 654 S.W.2d at 41. Thus, the trial court properly refused appellant's requested jury instruction.

◼ Assuming, arguendo, that the trial court did err in refusing to instruct the jury as requested, we conclude that any error was harmless. In *Brass* and in *Long v. State*, 681 S.W.2d 840, 844 (Tex.App.— Houston [14th Dist.] 1984, pet. ref'd), the Houston court held that the failure to instruct the jury on all terms and conditions of probation was harmless in light of the fact that the punishment exceeded the amount which would have entitled the defendants to probation. In this case appellant's jury assessed punishment at life imprisonment although it was instructed that probation was allowed when the punishment did not exceed ten years' confinement. Point of error five is overruled.

## VI. *Jury Misconduct*

In point of error six, appellant contends that the trial court erred in denying his motion for new trial based on the jurors' discussion of parole during deliberations at the punishment stage of trial. All twelve jurors testified at the hearing on the motion for new trial.

Juror Graves testified that the other jurors wanted to know when appellant would be paroled and two or three jurors did not want appellant ever to get back on the street. She wanted him to be paroled because she did not believe appellant was guilty. Juror Flavin told the jurors about a young man he went to church with who had killed two boys on the Trinity River. The man had gotten a long sentence and was out in three years. Juror Flavin also said that if appellant got a life sentence, he would not have to serve very long because his life expectancy was not very long. He probably would not serve more than a couple of years. According to Graves, Flavin asserted this as a matter of fact. She later voted for a life sentence based on the fact that he would only have to serve a couple of years. Juror Flavin also said that appellant would not get parole if he got 99 years.

On cross-examination, Graves admitted that Flavin never said he knew the law on parole. He just told them about the person he knew who got a long sentence and served only a few years. No one else claimed to know the law on parole. The jury foreman instructed them that they were not supposed to be talking about pa-

role. She voted for life rather than 99 years because she thought it would be less time for appellant to serve.

Juror Wagenbach testified that he was foreman of the jury. On four or five occasions conversation drifted into the parole area, and he reminded the group that parole was not something they were to consider. Juror Flavin recited from his personal experience that someone he knew was convicted of murder and paroled after a relatively short time. Flavin did not profess to know the parole laws, nor did anyone else.

Juror Garrett testified that Juror Flavin did not profess to know the law concerning parole. In fact, he admitted he did not know, that he was not a lawyer. He just recited the facts about a case he saw in the newspaper. The foreman admonished the jury that it was not to discuss parole. Flavin did not say appellant would get out of jail in two years if the jury assessed punishment at life imprisonment.

Juror Strong testified that Flavin said something to the effect that a person generally does not serve the amount of time that he is sentenced. Flavin did not profess to know the law; in fact, he prefaced his statement with, "I think...." She would characterize the statements as guessing. She could not remember if Flavin gave an example about a killing at Trinity River. The foreman told the jurors not to discuss parole. The jurors were concerned with the parole difference, if any, between a life sentence and a 99-year sentence. The jurors did not know the difference. Some suggested that there was no parole with a life sentence; others suggested that there was no parole with the 99-year sentence.

Juror Ralph testified that parole was discussed some, "but we were not to be concerned with that." No one on the jury knew what the parole law was, although "someone might have said something about incidents they read about or knew about."

Juror Crittenden testified that the jurors did not know enough about parole to dis-

cuss it. Any time parole was mentioned, the jurors all said they were not to discuss it. No one professed to know the parole law. Juror Flavin did not try to sway anyone to vote a particular way because of parole.

Juror Kinnebrew testified that she is married to a lawyer. Her husband does not practice criminal law and she has no special knowledge of criminal law. When parole was mentioned, she said that she felt the longer the sentence, the longer the accused must be in jail before being eligible for parole. She did not assert as a fact that she knew what the parole laws were. All the jurors knew that her husband was a probate lawyer and knew nothing about criminal law. She stated, "Everybody there knew that I knew nothing more than anyone else." Juror Flavin did not profess to know the law. He told the jurors about an incident he read about or heard about, and it was clear that that was his only source of information. The jurors spent a very short time discussing parole.

Juror King testified that there was some confusion about parole. No one professed to know the parole laws. She did not hear Juror Flavin relate an incident involving a shooting at the Trinity River. She was not sure whether anyone said appellant would serve only two or three years of a life sentence. She was surprised when the defense attorney told the panel after the verdict was announced that appellant would have to serve at least twenty years on his life sentence. She was surprised because she did not know the law.

Juror Moore testified that parole was mentioned, but that she could not recall very much about it because "it wasn't that big of a deal." No one professed to know the law. No one tried to tell them how many years appellant would actually serve.

Juror Lyman testified that parole was mentioned during the deliberations. Flavin mentioned something about someone from his church who was on parole. No one was trying to change anyone's vote when parole was discussed. No one professed to know

parole laws. No one tried to say how long appellant would have to serve on particular sentences. There was some generalized discussion regarding life sentences and life expectancy.

Juror Luton testified that the jurors wondered about parole but that no one knew anything about the subject. Flavin related the story about the man from his church, but Luton did not remember what he said about the sentence served. Parole was discussed as it related to life and 99–year sentences: "We don't know the laws, but we were giving our opinions of maybe what we thought."

Juror Flavin testified that the topic of parole was broached and that he supplied whatever information he had on the topic. His information was based upon an incident involving a member of his church. He told the jurors that his acquaintance had been sentenced to serve a substantial number of years but he did not serve the full term. Flavin did not know the initial sentence, nor did he specify the number of years actually served. He was speaking in generalities. He told the jurors that he was "just a geologist" and did not know parole laws. "I was just describing an experience as an analogy." He made no statement about how long appellant would serve if given a life sentence or 99 years. He could not remember saying that a person would not be eligible for parole if he got 99 years, nor did he recall any juror making such a comment. The jury foreman and one other juror reminded them that they were not supposed to discuss parole.

▮▮ It is common knowledge that from time to time inmates of the Texas Department of Corrections are released on parole. *Sneed v. State,* 670 S.W.2d 262, 264 (Tex.Crim.App.1984); *Austin v. State,* 531 S.W.2d 615, 618 (Tex.Crim.App.1975); *Taylor v. State,* 420 S.W.2d 601, 608 (Tex. Crim.App.1967). Nevertheless, the jury is not to discuss parole law when assessing punishment. Such discussion will not, however, constitute harmful error in all cases.

To show that a jury's discussion of the parole law constitutes reversible error, it must be shown that there was 1) a misstatement of the law 2) asserted as a fact 3) by one professing to know the law 4) which is relied upon by other jurors 5) who for that reason changed their vote to a harsher sentence. *Keady v. State,* 687 S.W.2d 757, 759 (Tex.Crim.App.1985); *Sneed,* 670 S.W.2d at 266.

▮▮ In applying this test to the undisputed facts of the instant case we find that: parole was discussed generally during deliberations at the punishment phase; no one professed to know the law regarding parole; most of the parole discussion revolved around the parole consequences of life and 99–year sentences; one juror related that a friend had received a long sentence and only served a short time; of the twelve jurors who testified at the hearing, only Graves testified that she relied on the parole discussion and changed her vote; Graves changed her vote to what she considered the lesser punishment; each time parole was discussed, the foreman or one of the other jurors reminded them they could not discuss it.

Based upon these undisputed facts, we conclude that appellant has failed to establish reversible error. No one professed to know the law of parole. Only juror Graves testified that she relied upon the parole discussion and changed her vote. To the extent that she changed her vote, it was not changed to a harsher punishment. Rather, she changed her vote to what she considered to be the lesser sentence. To the extent that the jurors discussed that someone was given a long sentence and served only a short time, there was no misstatement of the law.

▮▮ There was considerable dispute over the exact wording used during the parole discussion and over whether specific years were mentioned. There was also confusion about whether anyone said that there was no parole from a 99–year sentence. Issues of fact involving jury mis-

conduct raised at a hearing on motion for new trial are for the determination of the trial court, and there is no abuse of discretion in overruling the motion when there is conflicting evidence. *Keady*, 687 S.W.2d at 759; *Sneed*, 670 S.W.2d at 266. All the jurors, except Graves, testified that they were speaking in generalities and that no specific years were mentioned. Further, all the jurors, except Graves, testified that they were giving opinions rather than asserting facts. The trial court apparently chose to believe the other eleven jurors over Graves. Thus, the statements about parole were too general to be examined for inaccuracy and the parole discussion involved opinions or guesses rather than assertions of fact. Therefore, the evidence fails to establish reversible error. Point of error six is overruled.

## VII. *Verdict Not Unanimous*

■ In his seventh, and final, point of error, appellant contends that the conviction cannot stand because the verdict was not unanimous. Juror Graves testified at the hearing on motion for new trial that she never voted guilty. The other eleven jurors voted guilty and pressured her to vote guilty, too. The foreman told them they had to hurry because he had to leave town for a wedding. A pregnant lady told Graves that she was sick because of Graves. A bailiff told them they would have to stay all night if they did not reach a verdict.

Graves had been holding out, believing appellant had acted in self-defense, but she finally said, "You eleven people, you do whatever you want to do because you're not listening to me, anyway." When it came time to take the last vote, she told the foreman there was no reason to vote because she was not going to change her mind. The foreman said the judge might ask them each to stand and say whether he voted guilty and asked if they would have a problem with that. Graves said, "Yes, I do and I will not." Nevertheless, the foreman signed his name to the charge, saying they

all voted guilty. When the judge polled the jury, Graves raised her hand because she did not know what else to do.

Wagenbach, the jury foreman, testified that all votes were in writing. At the end, Graves joined the others in voting guilty. He looked at each vote carefully and counted twelve votes for guilty. Juror Ralph, sitting to his right, double-checked him. Before signing the verdict form, he told the jurors that the judge might ask each individually if that was their vote. He asked them to raise their hands in the jury room to confirm that each had voted guilty. He specifically looked at Graves and she raised her hand.

Juror Ralph confirmed that she served as de facto secretary. She also counted twelve guilty votes. Juror Garrett testified that she was sitting across from Graves. She saw her write "guilty" on her ballot. Garrett testified that she was pregnant and that she got sick during the deliberations. She did not, however, accuse Graves of making her sick. The other jurors stated that they did not hear Garrett make such an accusation.

Wagenbach testified that he had plans to fly to New Jersey for a family wedding. However, he felt comfortable with the court's assurance that something could be worked out. Thus, he did not pressure any of the jurors to reach a decision quickly in order to accommodate his plans. The other jurors confirmed that they knew Wagenbach had plane reservations and had plans to participate in a wedding. No one used this fact to pressure Graves or to hurry along the deliberations.

All the jurors denied hearing a bailiff say they would have to stay all night if they did not reach a verdict. Juror Luton testified that she thought, because of what she was taught in school, that they would have to stay all night if they did not reach a verdict. She never heard a bailiff say they would have to stay.

Juror Flavin testified that Graves stated she would not stand up and say she voted

guilty if the court polled the jury. She did not say this because of any strong conviction that he was innocent; rather, she was reluctant to stand and be singled out. She said that as long as she did not have to raise her hand, then she felt comfortable with a guilty verdict.

We acknowledge that a unanimous verdict is required in all criminal cases. *Brown v. State*, 508 S.W.2d 91, 93 (Tex. Crim.App.1974). We note, however, that it was for the trial court to resolve the conflicting testimony at the hearing on the motion for new trial. "Where questions of fact are at issue, the trial judge is the final word, absent abuse of discretion." *Keady*, 687 S.W.2d at 760. There is no abuse of discretion in overruling the motion for new trial when there is conflicting evidence. *Id.* at 759; *Sneed*, 670 S.W.2d at 266. The trial court obviously concluded, based upon conflicting evidence, that the verdict was unanimous. Finding no abuse of discretion, we overrule point of error seven.

Having overruled appellant's seven points of error, we affirm the judgment of the trial court.