NUMBER 13-12-00603-CR

 COURT OF APPEALS

 THIRTEENTH DISTRICT OF TEXAS

 CORPUS CHRISTI – EDINBURG

RICARDO MUÑOZ SANCHEZ A/K/A
RICARDO ALONSO SANCHEZ, Appellant,

 v.

THE STATE OF TEXAS, Appellee.

 On appeal from the 275th District Court
 of Hidalgo County, Texas.

 MEMORANDUM OPINION
 Before Chief Justice Valdez and Justices Rodriguez and Longoria
 Memorandum Opinion by Chief Justice Valdez

 A jury found appellant, Ricardo Muñoz Sanchez, a/k/a Ricardo Alonso Sanchez,

guilty of capital murder. See TEX. PENAL CODE ANN. § 19.03 (West, Westlaw through 2013

3d C.S.). Appellant received a life sentence without the possibility of parole. By two
issues, appellant contends that the evidence is insufficient and that the trial court

improperly admitted a video into evidence. We affirm.

 I. SUFFICIENCY OF THE EVIDENCE

 By his first issue, appellant contends that the evidence is insufficient to support his

conviction for capital murder. Specifically, appellant argues that the evidence is

insufficient “to show that [he] caused the death of [the victim]” and “to show that [he]

solicited, encouraged, directed, aided or attempted to aid or that [he] entered into any

agreement with anyone to commit the offense of robbery and/or burglary of a building.”

A. Standard of Review and Applicable Law

 In a sufficiency review, we examine the evidence in the light most favorable to the

prosecution to determine whether any rational fact finder could have found the essential

elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307,

319 (1979); see Brooks v. State, 323 S.W.3d 893, 898–99 (Tex. Crim. App. 2010). The

fact finder is the exclusive judge of the facts, the credibility of witnesses, and the weight

to be given testimony. Brooks, 323 S.W.3d at 899. We must resolve any evidentiary

inconsistencies in favor of the judgment. Id.

 We measure the legal sufficiency of the evidence by the elements of the offense

as defined by a hypothetically correct jury charge. Coleman v. State, 131 S.W.3d 303,

314 (Tex. App.—Corpus Christi 2004, pet. ref’d) (citing Malik v. State, 953 S.W.2d 234,

240 (Tex. Crim. App. 1997)). As charged in this case, the offense of capital murder

occurred if the person “intentionally commit[ted] the murder in the course of committing

or attempting to commit . . . burglary [or] robbery. . . .” See TEX. PENAL CODE ANN. § 19.03.

A person commits murder if he “intentionally or knowingly causes the death of an

 2
individual.” Id. § 19.02 (West, Westlaw through 2013 3d C.S.). A person commits the

offense of burglary of a habitation if, without the consent of the owner, the person enters

a habitation and commits or attempts to commit a felony, theft, or an assault. Id. §

30.02(a)(3); see Reyes v. State, 422 S.W.3d 18, 23–24 (Tex. App.—Waco 2013, pet.

ref’d). “A person commits [the offense of robbery] if, in the course of committing theft as

defined in Chapter 31 and with intent to obtain or maintain control of the property,

he . . . intentionally, knowingly, or recklessly causes bodily injury to another.” TEX. PENAL

CODE ANN. § 29.02 (West, Westlaw through 2013 3d C.S). A person commits a theft if

“he unlawfully appropriates property with intent to deprive the owner of property.” Id. §

31.03(a) (West, Westlaw through 2013 3d C.S.). Appropriation of property is unlawful if

it is without the owner’s effective consent. Id. § 31.03(b)(1).

 “Each party to an offense may be charged and convicted with the commission of

the offense without alleging that he or she acted as the principal or accomplice.” Id. §

7.01(b), (c) (West, Westlaw through 3d C.S.); Hayes v. State, 265 S.W.3d 673, 678–79

(Tex. App.—Houston [1st Dist.] 2008, pet. ref’d). Under the law of parties, “[a] person is

criminally responsible as a party to [capital murder] if the offense is committed by his own

conduct, by the conduct of another for which he is criminally responsible, or by both.”

TEX. PENAL CODE ANN. § 7.01(a) (West, Westlaw through 2013 3d C.S.). In addition, a

person is criminally responsible for the conduct of another for the offense of capital murder

if “acting with intent to promote or assist the commission of [capital murder], he solicits,

encourages, directs, aids, or attempts to aid the other person to commit [capital murder].”

Id. § 7.02(a)(2). When determining whether the evidence is sufficient to support that a

defendant participated as a party to a crime, we may consider “events occurring before,

 3
during and after the commission of the offense, and may rely on actions of the defendant

which show an understanding and common design to do the prohibited act.” King v.

State, 29 S.W.3d 556, 564 (Tex. Crim. App. 2000) (quoting Ranson v. State, 920 S.W.2d

288, 302 (Tex. Crim. App. 1994)). Under the law of parties, the defendant does not need

to be physically present at the commission of the offense in order for the evidence to be

sufficient. See Guevara v. State, 152 S.W.3d 45, 52 (Tex. Crim. App. 2004) (observing

that the penal code “does not require that a party to the crime be physically present at the

commission of the offense”) (citing Morrison v. State, 608 S.W.2d 233, 234 (Tex. Crim.

App. [Panel Op.] 1980)).

 In our sufficiency review, “direct evidence of the elements of the offense is not

required.” Hooper v. State, 214 S.W.3d 9, 15 (Tex. Crim. App. 2007). Circumstantial

evidence is as probative as direct evidence, and juries are permitted to make reasonable

inferences from the evidence presented at trial and in establishing the defendant’s guilt.

Id. “Circumstantial evidence alone can be sufficient to establish guilt.” Id. “[T]he lack of

direct evidence is not dispositive of the issue of a defendant’s guilt.” Guevara, 152 S.W.3d

at 49. “Each fact need not point directly and independently to the guilt of the appellant,

as long as the cumulative force of all the incriminating circumstances is sufficient to

support the conviction.” Thomas v. State, 444 S.W.3d 4, 8 (Tex. Crim. App. 2014);

Winfrey v. State, 393 S.W.3d 763, 768 (Tex. Crim. App. 2013); Ethridge v. State, 795

S.W.2d 281, 284–85 (Tex. App.—Houston 1990) pet. dism’d, 812 S.W.2d 600 (Tex. Crim.

App. 1990) (en banc).

B. Law of Parties

 4
 It is undisputed that Reyes Garcia, Jr. died as a result of a gunshot wound after

four masked men with guns entered his home on June 23, 2010 and took several of his

guns. The State presented evidence through eyewitness testimony that the four men

were involved in a home invasion, Garcia told the men that he did not have any more

money, the men beat Garcia, shot him, and when they left the men took four of Garcia’s

guns. From this evidence, the jury could have found that the four men committed the

offense of burglary by entering the home without the effective consent of the owner and

committed a theft by taking Garcia’s guns after shooting him. Moreover, the jury could

have concluded that because one of the men shot Garcia in the head, he had the specific

intent to kill Garcia. Medina v. State, 7 S.W.3d 633, 637 (Tex. Crim. App. 1999) (en banc)

(explaining that “specific intent to kill may be inferred from the use of a deadly weapon,

unless in the manner of its use it is reasonably apparent that death or serious bodily injury

could not result”) (quoting Godsey v. State, 719 S.W.2d 578, 580–81 (Tex. Crim. App.

1986)).

 The State acknowledges that it is unknown who actually pulled the trigger and shot

Garcia but argues that the evidence is sufficient under the law of parties to show that

appellant is guilty of capital murder. Appellant claims that the evidence failed to show

that appellant caused Garcia’s death, that appellant “solicited, encouraged, directed,

aided, or attempted to aid” the men who committed the offense, or that appellant “entered

into any agreement with anyone to commit the offense of robbery and/or burglary of a

building.”

 First, under the law of parties, the State was not required to prove that appellant

himself caused Garcia’s death. Instead, the evidence must have been sufficient to show

 5
that although the offense was committed by the conduct of another person, appellant was

criminally responsible for that person’s conduct. TEX. PENAL CODE ANN. § 7.01(b), (c);

Hayes, 265 S.W.3d at 678–79. To have been criminally responsible for the other person’s

conduct, appellant must have acted with “intent to promote or assist the commission of”

the offense by soliciting, encouraging, directing, aiding, or attempting to aid the other

person to commit the offense. See TEX. PENAL CODE ANN. § 7.02(a)(2).

C. Pertinent Facts

 Ricardo Perez Jr., an investigator with the Mission Police Department, testified that

on June 23, 2010, he responded to a crime scene at a home that had been ransacked

and where the body of a shooting victim had been found. Investigator Perez stated that

on July 9, 2010, appellant and Roxane Hernandez were arrested for drug possession and

that he observed a police interview of appellant. According to Investigator Perez, as part

of his investigation, he viewed a surveillance video that had been taken on the night of

the incident of four masked men arriving at Garcia’s home in a black Expedition.

Investigator Perez explained that he tried to identify possible suspects who could have

been in the surveillance video through “recognition of [their] body posture,” the person’s

“demeanor” when he walked, and the relationship that each suspect had to the other

suspects. Based on these considerations and his experience, Investigator Perez became

suspicious that appellant was involved in the crime. Specifically, Investigator Perez said,

“I said this may be a possible suspect that we’re talking to because he’s associated with

that black Expedition and the arrest with Roxanne Hernandez, who is sister to Jeffrey

Juarez.” Evidence presented at trial shows that the police considered Juarez “a person

of interest” in the crime and eventually arrested him.

 6
 The trial court admitted into evidence the surveillance video reviewed by

Investigator Perez. The video showed four masked men carrying weapons exiting a black

Expedition on the night of the offense in the victim’s neighborhood. Investigator Perez

testified, without objection, that after viewing the video, he believed “it is [appellant] that’s

being the driver that exited the driver side of the Expedition” and that the passenger is

Angel Falcon. Evidence shows that Falcon had also been arrested. Investigator Perez

stated that the police could not identify the other two men. The prosecutor asked, “Okay.

How do you know that it’s [appellant] in the video?” Investigator Perez replied,

 When I first came across him, when he was arrested in Pharr, he
 was brought to our police department. And looking at the surveillance
 video, when he’s walking out from the jail cell, in the video you see the driver
 as he walks like a cool walk, and he grabs his crotch area. [Appellant] had
 that cool walk, grabbing his crotch area. And that’s what got my attention
 right away. So, I started, you know, I started to build that he was a possible
 suspect and driver.

 We also found that there was blood on inside the Expedition. And I
 noticed that he had a healing cut, a little small cut on his hand. I don’t
 remember if it’s the right or left. And I know we photographed it because it
 was of interest to me that he had a cut and that there was blood in the
 vehicle. . . .

 ....

 Based on the observation, my observation of spending a little time
 with him, talking to him, looking at the video, knowing that there was blood
 in the Expedition, knowing that he had a cut, all these things, they’re building
 blocks for me. And the demeanor and posture. And even though he’s a
 masked individual, but you look at the structure, the body structure, and that
 led me to believe that he’s the driver. He’s in possession of that Expedition.
 Because he has borrowed it from the mother, the mother of the girlfriend.
 That’s what made me believe that it’s him. There’s no doubt to me it is him.

 Those are the information that I have that leads me to believe it is
 him.

 7
 Evidence was presented that on July 11, 2011, before he was arrested for Garcia’s

murder, appellant called his girlfriend, Laurie Aleman, from jail on several occasions and

discussed the murder of Garcia.1 During these telephone calls, which were recorded and

admitted into evidence, appellant asked Aleman to make “three-way calls” to several

people to discuss Garcia’s murder.2 Transcripts of the phone calls were also admitted

into evidence. During one conversation with Aleman, appellant stated, “I need you to do

me some three-ways and I need a, uh—damn it, babe, I’m stressing over this f***ing

cause. [I]t’s going to be hard to beat it, babe.” Appellant said, “[I]t’s going to be hard to

beat it. They got my f***ing blood [unintelligible].” Laurie asked, “Is that the [unintelligible]

they used,” and appellant replied, “Yes.” While she was testifying, the prosecutor asked

Aleman if she could explain what was unintelligible in question she asked Aleman.

Aleman clarified that she had asked appellant “about the truck they used.” During the

call, appellant told Aleman that he anticipated receiving a one-year sentence for one

offense that he had committed, presumably the drug offense, but that he was stressed

out about another unnamed offense. The evidence established that prior to this call to

Aleman, appellant had recently been interviewed by police regarding Garcia’s murder.

 Aleman asked appellant, “You are—you really think that’s the only thing you’re

gonna get,” and appellant responded, “But Torch is gonna take it. He’s gonna take the

blame, you know, so I’ll be clean. . . . The only thing is right now they’re not charging me

for that other thing, but I know tomorrow, hopefully I don’t—but I know they’re gonna come

 1 As previously mentioned, appellant was in jail after police arrested him with Hernandez for the

drug offense.
 2 During the conversations, the speakers used explicit language. We are unable to remove many

of the explicit language because doing so may affect the context of some of the conversations.

 8
charge me.” During the call, appellant told Aleman that “it’s a big ass charge, and then if

I get guilty babe, forget it, they’re going to give me life,” and Aleman replied, “But it wasn’t

you.” Appellant said, “I know but because it has my blood, I’ve been in situations like this

[unintelligible] I didn’t do shit babe, but because it has my blood, I don’t know what the

f*** this bitch did.”

 In these recorded calls, appellant asked Aleman to call a man referred to as “Coco”

and another man referred to as “Edward.” Aleman called Edward with appellant on the

line. Appellant informed Edward that he was in jail. During the discussion, Edward

indicated to appellant that “it got all f***ed, bro” and “you are gonna beat them.” Appellant

responded, “I know, I’m gonna beat them bro, it’s just that it’s the, the G ride, they’re

getting DNA from it and I have—.” Again, appellant is referencing the DNA evidence

found in the truck used in Garcia’s murder. Appellant told Edward that “since [he] had

gotten into a fight, [he] had blood in the truck and now they are going to try to f*** me.”

Appellant said, “F***ing Coco I don’t know what, I’m calling him and he doesn’t answer,

bro. Look buddy, my, my time is running out, I’ll probably give you a—.” Edward asked,

“What do you want me to do, bro,” and appellant replied:

 Look, I need you to call Coco, bro tell him to answer the f***ing phone, look,
 the toys I had already told Coco to bury them, bro, to get one for him—the
 John Wayne and suddenly [unintelligible] one, one shotty, bro, and the rest
 to bury them, bro, because, uh, and have them take the serial numbers off
 of them, buddy. . . . Buddy, if they catch someone with those serial
 numbers, bro, they’re gonna let them have it, bro. . . . I’m telling you. And
 the Baretta, bro, you have to tear it apart. . . . The Baretta you have to melt
 it down, bro.

 Edward then called Coco on his three-way line with appellant on the other line.

Appellant informed Coco that his phone time was running out and instructed him to

answer his phone when appellant’s girlfriend called him. Appellant said, “Hey, my, my

 9
chick is going to call you in a while, bro, to, to give you stuff, to see where you can get rid

of it.” Coco stated, “Yes, I know, I want her to know that.” Appellant said, “—all right, I

need you. Tuerca is getting out in a week. In [a] while my chick is going to call you to

give you stuff bro, and get rid of it wherever you can, bro, all right. . . . You know how to

do it, bro. Point three, everything bro, everything, everything for, pure profit. I love you

bro, take care. Hey, the toys, don’t give those to the bros. Take the serial numbers off

of them and stash them.” Coco stated that he would follow appellant’s directions.

 Appellant asked Aleman to call a friend named “Jasmine,” later identified as a

witness for the State, Jasmine Pauline Gonzalez. 3 Aleman complied. Jasmine informed

appellant that Jasmine’s mother, later identified as Jessica Gonzalez, had been arrested.

Jasmine informed appellant that “[e]verybody’s taking a lot of shit in here, blaming it on

me.” She stated that she had already given her statement to the Mission Police

Department. Appellant told Jasmine that he “needed her” help and asked her to make

another statement to the police. Jasmine replied, “Yeah, but I already let—I already did

my statement. How can I renew my statement and lie about my statement?” Appellant

replied, “Why did you f***ing do a statement? You already knew not to do a statement.”

Jasmine said, “They—[appellant], the first day that they came ‘cause of the truck, they

were gonna arrest my mom, my grandma for that shit.” Appellant reiterated that he

“needed” Jasmine’s help, and told her that he was not “gonna come out.” Jasmine

responded, “Well, what do I do now? Now I go have to go back and lie?” The following

colloquy occurred:

 [Appellant]: No, just tell them that it was—you were just with him for like
 two—you were just with him for two weeks.

 3 For purposes of reader ease, we will refer to her by her first name, Jasmine.

 10
Jasmine: Well, you too. Why the hell do you have to also f*** around,
 [appellant].

[Appellant]: Jasmine, don’t do it like that. It wasn’t even me, it wasn’t even
 me, hell with that, don’t be saying shit like that.

Jasmine: Oh.

[Appellant]: I didn’t do that f***ing shit.

Jasmine: I know you didn’t.

[Appellant]: Don’t do me like that, Jasmine, you know that if I’m f***ing
 found guilty for that shit, I’m not gonna f***ing come out, never.
 Hey.

Jasmine: What?

[Appellant]: I need you Jasmine, man, you know that I don’t f***ing—man,
 you know I need you. I need you, I need you to be strong.

 ....

[Appellant]: Everything’s gonna be all right. Everything’s gonna be all
 right, but you have to tell them the truth. Jasmine—

Jasmine: I know.

[Appellant]: You need to tell them that your guy, would use the truck too.

Jasmine: I know, I already know, and he did use it.

[Appellant]: Jasmine, damn it, Jasmine, I need you more than ever. I know
 that your mom is in this shit, but you know that if I get out,
 Jasmine, I get out and man, I’ll, I’ll, I’ll owe you my . . . life, I’ll
 do anything—

Jasmine: No [unintelligible] you don’t need to give me nothing, I already
 see how it is, I already see how you are, but I’ll try to do
 something, I’ll—

[Appellant]: What do you mean how I am?

Jasmine: Yes, taking other f***ing [women] in my truck. No it’s cool—

 11
[Appellant] Who the f*** had other [women]?

Jasmine: —everything is cool [unintelligible].”

[Appellant]: Hey, they didn’t stop me with another chick.

 ....

Jasmine: I’m down with you, I’m down with you, I’ll do anything
 [unintelligible]

 ....

Jasmine: I’m trying to do my . . . best, [appellant]. I’m trying. I’m trying.
 I want to go over there, and I’m scared that they’re gonna take
 me in ‘cause I’m lying. I’m you know—I don’t know what to
 do.

[Appellant]: No, Jasmine. You’re not lying. You’re just telling them the
 truth. Just, look Jasmine, Jasmine, you’re mom has—
 Jasmine you know how to run this shit, all right.

 ....

 You know. You just say it crying, start crying, that hey, that
 you were with this guy, but you never thought nothing of him,
 the guy was, you know from Mexico, and all—all of a sudden
 he just came back and he gave you the truck [unintelligible]
 clean and whatever the f*** and he left.

Jasmine: And why, and why, why they’re giving you that for?

[Appellant]: Because, Jasmine, ‘cause my DNA is on the f***ing truck.

Jasmine: On the truck, but it’s like maybe you were—you punched
 [Aleman] or something.

[Appellant]: I know, it did, remember, but I don’t know why they’re doing it
 to me.

Jasmine: Your hand was bleeding when the—

[Appellant]: Yes, but do they know that? They do not know that, Jasmine.

Jasmine: That’s why I said, to my . . . statement, that’s what I was trying
 to say, I mentioned [Aleman], I thought that it was that—that

 12
 you punched her and you—you had a cut and you bleed, and
 I don’t know what. I said that.

[Appellant]: But they told me that you guys said that only I drove the truck.

 ....

[Appellant]: Jasmine I need you, Jas—that’s why I gave you—I knew well
 that you shouldn’t give a . . . statement.

Jasmine: No, I didn’t know that. For real, I didn’t even know what was
 happening, they were coming to arrest my grandma. We were
 at the bar, they came over here, and they were arresting my
 grandma for—for attempted murder, capital murder,
 whatever. And my mom, grandma was all scared like they—
 they already wanted to arrest her. She was all scared—she
 was like—No, this is my daughter’s truck. So, I came over
 here, and then they wanted—oh well we need to go in—
 they—they had—I had to go in that day, if not they were going
 to arrest me.

 ....

[Appellant]: I just need you to help me out on this on Jasmine. Please,
 you know if I’m found guilty on this shit, I’m never gonna come
 out you know, and I don’t deserve this shit Jasmine—

 ....

Jasmine: I ain’t gonna be weak, yo, I’m not being sad, ‘cause I’m just
 going to go back over there and I’m gonna say whatever I
 gotta . . . say. I know, okay.

[Appellant]: Jasmine, you know that I wouldn’t, I would never . . . do shit
 like that.

 ....

[Appellant]: But are you going to help me out?

Jasmine: I’m trying, [appellant], I want to go back—

[Appellant]: Jasmine, are you going to help me out? Tell me the truth,
 ‘cause you don’t sound too . . . confident.

 13
Jasmine: Yes, I am [appellant].

[Appellant]: You’re gonna let me . . . stay in here or what?

Jasmine: No.

[Appellant]: You don’t sound too confident, Jasmine.

Jasmine: [Appellant], I’m gonna try, I’m gonna try [unintelligible] it’s
 ‘cause I don’t know how to say it, I don’t know how to say it
 but—

[Appellant]: Look—look Jasmine, this is what you’re—Jasmine, this is
 what you’re going to say, like start crying—

Jasmine: I already know—

[Appellant]: Start crying—

Jasmine: That’s my boyfriend Felix, I don’t know what—

[Appellant]: There you go, start, start, you know, just tell ‘em the truth you
 know, tell ‘em like, that you—you were with him, but you—it
 was nothing serious you know that, you would lend it to him,
 and that your mom didn’t know, and whatever the f***.

Jasmine: See that’s why I’m . . . mad—

[Appellant]: It was around—

Jasmine: I needed this, I needed this shit . . . from the beginning to know
 this shit. It’s—that’s why if you knew something was up, why
 don’t you tell me anything—

[Appellant]: Baby, I was . . . locked up, they wouldn’t let me use the phone.

Jasmine: No, I know, but like before like—

[Appellant]: Nothing was—

Jasmine: Why don’t you tell me this before like, so I could know, you
 know what I mean? If anything happens, I know what to say
 in the beginning. You know—

[Appellant]: I’m sorry. I’m sorry—

 14
Jasmine: I didn’t know nothing about this, babe—

[Appellant]: I’m sorry.

Jasmine: —I don’t nothing

[Appellant]: Hey.

Jasmine: You know, I didn’t know what to go, what the f***ing statement.
 You know how . . . stupid I am. I didn’t even know what the
 f*** that shit was.

 ....

[Appellant]: You’re not gonna let me stay in here, right?

Jasmine: No, I’m not.

[Appellant]: All right. Hey, Jasmine, you know when I come out, man, I’ll
 owe you guys whatever man, I’ll . . . do whatever for you guys,
 you know that I will, I’m good, I’m worth it, all right?

 ....

[Appellant]: Wait, wait. Let me talk to you, let me talk to you. Hey,
 Jasmine, look, they don’t know shit, babe, they don’t—

 ....

[Appellant]: You know how the . . . show runs. They don’t know anything.
 They don’t know shit, and, there’s not—we—there’s nothing
 in—there’s no way we can help them, why? ‘Cause we didn’t
 do shit, all right?

Jasmine: All right.

[Appellant]: But you, Jasmine, if you can help out, just tell them that stuff,
 what Mitzi told you, but you need to get the story straight. You
 need to talk to Mitzi, make every—make everything—

Jasmine: That’s why I told her, I told her, I’m—come over here and let
 me talk to you. Let me talk to you in person.

 15
[Appellant]: And what did she say?

Jasmine: ‘Cause I can’t be doing—

[Appellant]: She said she could do it. She’ll go over there.

Jasmine: Yeah I know, but right now I’m going to the Mission P.D.

[Appellant]: What’s more tell . . . Mitzi to take you. Tell Mitzi if she could
 take you.

 ....

[Appellant]: You already, get everything straight, get the address, around,
 it was around June 20th, June 15th, June 20th that you were
 with this guy, you were with him for two weeks, one day he
 arrived, he came back with the truck real clean and, and he
 left, he bought you the new clothes, all right? He had a lot of
 money. Jasmine.

Jasmine: All right, I’m listening.

[Appellant]: Don’t let them break you. Jasmine. Don’t let them break you.

 ....

[Appellant]: They’re trying to scare you. Why are they—why are they
 going to take you, they don’t got no reason to, but they’re
 gonna. They’re gonna, you know. They’re gonna scare you
 like, oh, we this, we know this, we know that, bullshit Jasmine.
 Stick to the mother ****ing plan, all right?

 ....

[Appellant]: Hey, I got a family too, all right? Please make your story
 straight. Talk to Mitzi, get everything straight, all right?

Jasmine: All right.

[Appellant]: Hey, get everything straight, but please, Jasmine, don’t let me
 down, please, Jasmine.

 16
 In a subsequent conversation with Aleman, appellant said, “[B]abe, if my blood

wouldn’t have gotten there, I might have made, but they’re going to do lab work all over

it, they’re gonna—” Appellant also stated that he believed that Jasmine and her mother

would testify against him. Appellant instructed Aleman to call “Mitzy” and to tell Mitzy “to

give [Aleman] information about Jasmine.” Appellant said, “tell Mitzy to keep telling

Jasmine to please help me, to please help me, to please help me, to keep calling her and

telling her please help me for, for them not to bullshit her, that I need her, all right?”

Appellant told Aleman to talk to Jasmine and to tell her that when appellant got out of jail,

“we’ll give her a lot of money, and we’ll help her out in whatever, tell her please that I have

a family that if I get charged with this, I’m never going to come out.” Appellant said,

 Right now I’m going to write to you. Hey, and tell Mitzy that, to, if
 Jasmine already has a name and where he’s from. Tell Jasmine to get
 her . . . story straight babe, I need Jasmine, baby, I need her babe, you
 know she’s the only one that can help me out. Her and her mom, her mom
 is down for me babe. Just tell her not to . . . for them to be strong, not to let
 them bullshit her, not to sign no papers—.

 At trial, Jasmine testified that she, her mother, and appellant were the only people

who drove the vehicle used in Garcia’s murder. According to Jasmine, she dated

appellant in June of 2010. Jasmine stated during that time, that she lent the vehicle to

one other man on one occasion, but she was present in the vehicle at the time. At no

time did Jasmine lend the vehicle to someone other than appellant without being present

in the vehicle. Jasmine stated that “sometimes” she lent the vehicle to appellant and did

not accompany him. Jasmine could not recall how many times she loaned the vehicle to

appellant while she was not also in the vehicle. Jasmine testified that on July 9, 2010,

appellant was in possession of the vehicle. Jasmine explained that although appellant

was being held by the Pharr Police Department, she “went looking for him” on that date

 17
and found the vehicle at appellant’s mother’s house. According to Jasmine, she observed

many police officers at that location.

 Jasmine testified that when she spoke to appellant on the phone, he asked her to

lie “about a guy using her truck.” Jasmine acknowledged that she told appellant she

would tell the police what appellant asked her to say; however, Jasmine never told police

what appellant asked her to say because she “had already left a statement.” On cross-

examination, Jasmine stated that the vehicle belonged to her mother, Jessica Gonzalez.

 On July 12, 2010, Alejandro Madrigal Jr., a forensic scientist with the Department

of Public Safety Crime Laboratory, assisted the Mission Police Department in collecting

evidence from the vehicle used by the suspects during the commission of the offense.

The vehicle was a black 2000 Ford Expedition. Madrigal took swabs of what appeared

to be blood located on the driver’s side area of the vehicle for DNA testing. Madrigal then

compared appellant’s DNA with that found in the vehicle. Madrigal explained, “The items

that we went over and we compared was AM6-A, which was jeans, the Guess jeans, AM-

7, which were the Dristan jeans, AM-10, which was the swabbing from the steering wheel.

And AM-14, which was the driver’s side center console.” Madrigal stated that “[t]he

findings were that the DNA recovered from the items were consistent with the DNA profile

of [appellant]” and appellant “cannot be excluded as a contributor of these profiles.”

According to Madrigal, “the probability of selecting an unrelated person as a random who

could be the source of these profiles [found in the vehicle] is approximately 1 in 36.28

quintillion for Caucasians. 1 in 4.230 quintillion for Blacks. And 1 in 2.163 quintillion for

Hispanics.” Madrigal concluded “[t]hat to a reasonable degree of scientific certainty,

[appellant] is the source of those [blood] stains” found in the vehicle.

 18
 Rolando Mendoza, a Mission Police Department crime scene technician, testified

that he executed a search warrant of a residence located at 207 Camino Real, Apartment

6 on July 13, 2010. Mendoza recovered, among other things, a black tactical shotgun

“Remington 870” with serial number “[A]B796139[M].”4 The prosecutor showed Mendoza

State’s Exhibit No. 15 and asked, “Can you verify if it is, or is not the same serial number?

Mendoza replied, “It is the same one, ma’am.” State’s Exhibit No. 15 is a receipt of

Garcia’s purchase of a weapon “REM 870” with serial number AB796139M. In addition,

regarding the gun found by police, Adrian Garcia, the victim’s brother, stated, “I’m certain

one hundred percent that’s my brother’s weapon.” Adrian Garcia explained that the

victim’s gun was unique because it was custom-made and “it is very rare to see” a gun

with the “features” that this particular gun had. Guadalupe Garcia, the victim’s other

brother, stated that the gun belong to the victim.

 Sergeant Jody Allen Tittle, a police investigator with the City of Mission police

department, testified that he confirmed that the serial number of the black shotgun found

at the Camino Real apartment matched a gun purchased by Garcia. Sergeant Title also

testified that the vehicle in appellant’s possession was the same vehicle used in Garcia’s

murder. In addition, Sergeant Tittle described State’s Exhibit Number 35-B as a size

“large” dark brown glove recovered at the crime scene. The prosecutor then asked

Sergeant Tittle to observe State’s Exhibit Number 70-A, another size large dark brown

glove that Sergeant Tittle stated matched the glove found at the crime scene. Sergeant

Tittle did not know where State’s Exhibit 70-A was discovered. However, Madrigal

 4 The reporter’s record indicates that Mendoza testified that the serial number was “8B796139N.”
However, Mendoza also testified that the serial number was identical to the serial number listed on State’s
Exhibit Number 15, which shows the serial number as being AB796139M.

 19
testified that he found the brown glove identified as State’s Exhibit 70-A in the glove

compartment of the Expedition.

 Vicente Ochoa Jr., an investigator with the Mission Police Department, testified

that he had been assigned to work on this case on June 25, 2010 and that on July 12,

2010, he began his investigation concerning appellant’s recorded phone calls from the

county jail. Investigator Ochoa stated that he listened to nine phone calls and attempted

to determine who the phones were registered to and to get “pings” on the GPS location

of the phones from the phone service providers. Investigator Ochoa clarified these

“pings” would help “locate . . . where these people were at in regards to, since they were

possibly getting rid of evidence.” According to Investigator Ochoa, they received a “hit”

to one of the numbers at the location of “Camino Real, 200 block in San Juan,” Texas.

Investigator Ochoa clarified that two numbers pinged to the 200 Camino Real area, which

included the phone number used by a man referred to as Coco.

 Based on this information, the police set up a surveillance of the Camino Real

area. Investigator Ochoa stated, “In the early morning we see a male subject come out

of the area side of the apartment. We make contact with him. He identifies himself as

Coco. And we get his correct name as being Juan Briones.” Investigator Ochoa testified

that they made “the link that the same person on the phone calls [with appellant] from the

jail that we got mentioned is a Coco. . . . We realize that it’s the same person from there.”

According to Investigator Ochoa, the police then transported Coco to the police

department, and Investigator Ochoa assisted in the execution of a search warrant at 207

Camino Real. Investigator Ochoa testified that they found several weapons at this

location, which included a “distinctive shotgun” that was located under the bed.

 20
Investigator Ochoa stated, “One of the weapons was recovered, which was a tactical

shotgun, through the investigation we discovered was a weapon that was purchased by

the victim at the Armory store in McAllen[, Texas]. Serial number did match up to the

weapon that [the victim] purchased.”

 Investigator Ochoa observed a body search of appellant that was taken after blood

was found in the vehicle used in the crime. Evidence was presented that appellant

resisted the body search and that he “put up a pretty good struggle.” During this body

search, the police photographed a “healing cut” that appellant had on his hand.

Regarding the investigation of appellant’s connection with the offense, Investigator Ochoa

said,

 We’re able to determine that there is some items at the crime scene
 that match up to [appellant], as far as his right hand, a figurine that was
 broken when the suspects crossed over the fence in order to gain entry into
 the property, the vehicle being driven by [appellant], and blood found inside
 the vehicle.

 On cross-examination by appellant’s trial counsel, Investigator Ochoa explained

that the victim had a “rod iron fence” with a decorative figurine welded on top, which the

police found next to the fence. Investigator Ochoa stated that the vehicle used by the

suspects was linked to appellant because “[h]e’s the person supposed to be driving it, the

vehicle” and that “[i]n the video [appellant] matches the description of the driver.”

Investigator Ochoa stated that he believed the video showed that the driver of the vehicle

matches appellant “[b]y his body build.” Investigator Ochoa testified that from what he

“gathered from [Jasmine’s mother Jessica], she says that [appellant] had the vehicle”

when the crime occurred and that Jessica “told” Investigator Ochoa that appellant “was

the one using it.”

 21
D. Analysis

 Appellant argues that the evidence is insufficient to support the jury’s finding that

he committed the charged offense. However, we disagree with appellant, and we agree

with the State that the evidence, as set out below, supports the jury’s verdict.

 During his phone conversations, appellant did not explicitly state that he was

discussing Garcia’s murder. However, throughout these conversations, appellant alluded

to facts that the evidence at trial established were connected to Garcia’s murder. These

facts included appellant’s concern: (1) about DNA from his blood that police discovered

in the vehicle used by the suspects the day after appellant talked to Aleman; (2) about

weapons that were in the possession of a man referred to as “Coco”; and (3) that he

would receive a life sentence for the “other thing” that he had not been charged with that

was “a big ass charge.”5 From this evidence, the jury could have reasonably found that

appellant had knowledge of details of Garcia’s murder because he was somehow

involved especially given appellant’s concern that he would receive a life sentence for

Garcia’s murder and his concern that his DNA was located in the vehicle used by the

assailants and the fact that the police located one of the stolen weapons in Coco’s

possession based on appellant’s phone call to Coco. See Ethridge, 795 S.W.2d at 285

(explaining that attempts to conceal or destroy contraband is sufficient evidence of “guilty

knowledge”). The jury could have also taken into consideration appellant’s prediction that

the police would find his blood in the vehicle to use against him as an indication that

 5 We must view the evidence in the light most favorable to the jury’s verdict; thus, to convict
appellant, the jury must have determined that the vehicle appellant used was the same vehicle used to
commit the offense, which is supported by evidence that the vehicle used during the commission of the
offense had the same damage to the side step as the vehicle found in appellant’s possession. See Jackson,
443 U.S. at 319; see also Brooks, 323 S.W.3d at 898–99.

 22
appellant was involved because the police would discover his DNA and link him to crime

scene. See Torres v. State, 794 S.W.2d 596, 598 (Tex. App.—Austin 1990, no pet.) (“A

‘consciousness of guilt’ is perhaps one of the strongest kinds of evidence of guilt. It is

consequently a well[-]accepted principle that any conduct on the part of a person accused

of a crime subsequent to its commission, which indicates a ‘consciousness of guilt’ may

be received as a circumstance tending to prove that he committed the act with which he

is charged.”) (internal quotations omitted) (citing Ray, TEXAS PRACTICE VOL. 2, LAW OF

EVIDENCE, § 1538, at 242 (1980)). In addition, appellant told Aleman “****, babe, if my

blood wouldn’t have gotten there, I might have made, but they’re going to do lab work all

over if they’re gonna.” From this evidence the jury may have found that appellant felt that

without the blood evidence the police would not be able to link him to the crime. Moreover,

from this, the jury may have inferred that appellant believed that the blood in the vehicle

would somehow inculpate him in Garcia’s murder. Thus, viewing the evidence in the light

most favorable to the jury’s findings, we conclude that the combined force of the above-

citied evidence leads to a reasonable inference that appellant left the blood in the vehicle

at the time that the crime occurred. See Hooper, 214 S.W.3d at 15 (noting that, although

the fact-finder is not permitted to reach conclusions based on mere speculation, “direct

evidence of the elements of the offense is not required,” the fact-finder is “permitted to

make reasonable inferences from the evidence presented at trial,” and circumstantial

evidence “is as probative as direct evidence” in establishing guilt and stating, “[u]nder the

Jackson test, we permit juries to draw multiple reasonable inferences as long as each

inference is supported by the evidence presented at trial”).

 23
 The evidence shows that when appellant called Coco, he asked him to dispose of

some “toys” and to ensure that these “toys” lacked serial numbers. The evidence

presented at trial established that Coco had possession of one of Garcia’s customized

rifles. From this evidence, the jury could have reasonably inferred that when appellant

mentioned “toys,” he was discussing the guns that had been stolen from Garcia’s home

and that appellant had authority to tell Coco what to do with the weapons. The jury could

also have reasonably inferred that appellant wanted Coco to dispose of the weapons

because appellant feared that the weapons would be linked to him, and he wanted to

destroy any evidence that may have been on those weapons, such as fingerprints, to hide

his involvement. In addition, the jury may have reasonably inferred that appellant wanted

to either destroy or conceal the guns because he was involved in Garcia’s murder. See

Ethridge, 795 S.W.2d at 285; Gordon v. State, 735 S.W.2d 510, 517 (Tex. App.—Houston

[1st Dist.] 1987), aff’d, 784 S.W.2d 410 (Tex. Crim. App. 1990) (providing “that appellant

demonstrated a guilty mind by attempting to destroy incriminating evidence”); see also

Cueva v. State, 339 S.W.3d 839, 881–82 (Tex. App.—Corpus Christi 2011, pet. ref’d)

(“Any conduct on the part of a person accused of a crime subsequent to its commission,

which indicates a consciousness of guilt may be received as a circumstance tending to

prove that he committed the act with which he is charged.”) (citations omitted).

 Moreover, the jury could have reasonably found from this evidence that appellant

had authority to determine how the men dealt with the guns and infer that because

appellant took a leadership role in the destruction of the evidence, he must have

participated in the execution of the home invasion by soliciting, encouraging, directing,

aiding, or attempting to aid another person in committing the crime in this case. See TEX.

 24
PENAL CODE ANN. § 7.02(a)(2). The jury could have reasonably found from the evidence

that Coco had already disposed of some of the guns taken from Garcia’s residence

because appellant stated, “I already told Coco to bury [the guns]” and although four guns

were missing from Garcia’s home, Coco only had one gun at the Camino Real property.

 During his conversation with Jasmine, appellant asked her to change her

statement to police. And, Jasmine testified that he wanted her to lie about lending her

car to someone else. During the conversation, appellant instructed Jasmine to “just say

it crying, start crying” and to tell the police that the man is from Mexico and “that all of a

sudden he just came back and he gave you the truck . . . clean and whatever the f*** and

he left.” Appellant told Jasmine that the police indicated that she said in her statement

that she only lent her truck to him and that she needed to go back to the police and tell

them that she had lent her truck to another man around the date of Garcia’s murder and

to tell the police that her mom did not know that she had lent the truck to someone other

than appellant. Jasmine responded that she was angry because she needed this

information “from the beginning to know this shit” and asked why appellant had not told

this earlier so that she knew “what to say in the beginning.”

 Appellant claimed that if Jasmine changed her statement that he would not be kept

in jail and stated, “look, they don’t know shit. . . .” Appellant advised Jasmine to “get

everything straight” and that she needs to “get the address, around, it was around, June

20th, June 15th, June 20th that you were with this guy, you were with him for two weeks,

one day he arrived, he came back with the truck real clean and, and he left, he bought

you the new clothes, all right?” From the foregoing evidence the jury could have found

that appellant had a consciousness of guilt due to his involvement in the murder. See

 25
Lozano v. State, 359 S.W.3d 790, 814 (Tex. App.—Fort Worth 2012, pet. ref’d) (“Attempts

to conceal incriminating evidence, inconsistent statements, and implausible explanations

are also probative of wrongful conduct and are circumstances of guilt.”) (citing Gear v.

State, 340 S.W.3d 743, 747 (Tex. Crim. App. 2011) (“In addition, this Court has recently

recognized that a fact finder can consider a defendant's untruthful statement (in this case

two “implausible” and inconsistent statements by appellant) as affirmative evidence of

guilt.”)); Cueva, 339 S.W.3d at, 882 (“[A]ttempts to tamper with a witness, and any criminal

act designed to reduce the likelihood of prosecution, constitutes evidence of

‘consciousness of guilt’ on the part of the defendant.”) (citations omitted); see also Garza

v. State, 172 Tex. Crim. 468, 358 S.W.2d 622, 623 (Tex. Crim. App. 1962) (explaining

that the efforts of an accused to induce a witness to testify falsely may be shown as

indicating a consciousness of guilt).

 Finally, Investigator Perez gave his opinion that the driver in the video was

appellant and the jury observed that video. Investigator Perez based his opinion on the

distinctive way that appellant moved and walked. He also testified that all of the

circumstantial evidence pointed to appellant’s involvement in the crime.

 Although the majority of the evidence in this case is circumstantial, viewing the

evidence in the light most favorable to the jury’s verdict, we conclude that the cumulative

force of all of the surrounding facts and incriminating circumstances is sufficient to support

the jury’s conclusion that appellant, acting with intent to promote or assist the commission

of the capital murder of Garcia, solicited, encouraged, directed, aided, or attempted to aid

the other person to commit the capital murder. See TEX. PENAL CODE ANN. § 7.02(a)(2);

Thomas, 444 S.W.3d at 8; Winfrey, 393 S.W.3d at 768; Ethridge, 795 S.W.2d at 284–85;

 26
Torres v. State, 141 S.W.3d 645, 662 (Tex. App.—El Paso 2004, pet. ref’d) (holding, in a

circumstantial-evidence case, that the cumulative force of all the surrounding facts and

incriminating circumstances was sufficient to support the jury’s conclusion of guilt);

Mashburn v. State, 272 S.W.3d 1, 14 (Tex. App.—Fort Worth 2008, pet. ref’d) (explaining

that the trier of fact may infer a culpable mental state from the acts, words, and conduct

of the accused and may also infer intent from acts that indicate a consciousness of guilt.).

Therefore, we conclude that under the law of parties, the evidence is sufficient to support

appellant’s conviction. We overrule appellant’s first issue.

 II. ADMISSION OF VIDEO

 By his second issue, appellant contends that the trial court erred by admitting the

surveillance video of the perpetrators entering Garcia’s home. Specifically, appellant

argues that pursuant to rule of evidence 403, the video “‘is highly prejudicial’ in that it

plays to the prejudices of the jury by using fear as a tactic to confuse the jury” and that

any probative value in this evidence was slight at best.” Appellant points out that the men

in the video wore masks and claims that “no evidence was adduced that ANY of the

persons in the video were identified.”

 We review the trial court’s decision to admit evidence for a clear abuse of

discretion, and we will not reverse the judgment if the decision lies within the zone of

reasonable disagreement. McCarty v. State, 257 S.W.3d 238, 239 (Tex. Crim. App.

2008). Texas Rule of Evidence 403 permits a trial court to exclude relevant and otherwise

admissible evidence “if its probative value is substantially outweighed by the danger of

unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of

undue delay, or needless presentation of cumulative evidence.” TEX. R. EVID. 403 (1998,

 27
superseded 2015).6 Admissibility of the evidence is favored under a rule 403 analysis,

and “the presumption is that relevant evidence will be more probative than prejudicial.”

Montgomery v. State, 810 S.W.2d 372, 389 (Tex. Crim. App. 1991) (en banc). “[T]he

plain language of Rule 403 does not allow a trial court to exclude otherwise relevant

evidence when that evidence is merely prejudicial.” Pawlak v. State, 420 S.W.3d 807,

811 (Tex. Crim. App. 2013). Under rule 403, the trial court must only exclude evidence

that causes “unfair” prejudice, which refers “to relevant evidence’s tendency to tempt the

jury into finding guilt on grounds apart from proof of the offense charged.” State v.

Mechler, 153 S.W.3d 435, 440 (Tex. Crim. App. 2005).

 The video’s probative value was that it showed the jury the vehicle that was used

by the suspects during the commission of the crime to aid the jury in its evaluation of

whether the State proved that it was the same vehicle that appellant possessed. At trial,

evidence was presented that the vehicle appellant possessed and that Jasmine had

loaned him had damage to the side step that matched damage to the vehicle used in the

commission of the crime. Thus, the trial court could have determined that the jury needed

to view the video in order to make this determination.

 Appellant argues that the video was prejudicial because it was used as a “scare

tactic” and no evidence was presented that he was present during the commission of the

offense. However, to find unfair prejudice the video must have had a tendency to tempt

the jury into finding guilt on grounds apart from proof of the offense charged. Mechler,

 6 The Texas Supreme Court and Texas Court of Criminal Appeals amended rule 403 to become
effective on April 1, 2015. It now states, “The court may exclude relevant evidence if its probative value is
substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues,
misleading the jury, undue delay, or needlessly presenting cumulative evidence.” TEX. R. EVID. 403.

 28
153 S.W.3d at 440. And, although the men in the video wore masks, evidence was

presented that the driver of the vehicle had appellant’s body type, demeanor, and walk.

Moreover, at trial, the victim’s son testified in detail about what occurred that night in his

home. Those details were likely much more disturbing to the jury than the video which

merely shows the vehicle parked in the street and that four masked men, some with guns,

exited the vehicle. The video also shows that there was damage to the passenger side

step which matched damage to the side step on the vehicle appellant possessed. Thus,

we cannot conclude that the video had the tendency to tempt the jury into finding guilt on

grounds apart from proof of the offense charged. See Mechler, 153 S.W.3d at 440.

Accordingly, the trial court did not abuse its discretion in admitting the video over

appellant’s rule 403 objection. We overrule appellant’s second issue.

 III. CONCLUSION

 We affirm the trial court’s judgment.

 /s/ Rogelio Valdez
 Rogelio Valdez
 Chief Justice

Do not publish.
TEX. R. APP. P. 47.2(b).

Delivered and filed the
14th day of May, 2015.

 29